In accordance with the opinion of the Supreme Court of Alabama in this cause (January 9, 1981) reversing our judgment heretofore rendered, we proceed to review the case on appeal as to all issues presented other than the one determined by the Alabama Supreme Court. *Page 221 
Two issues on appeal relate to the composition of the jury roll of Baldwin County, the placement of cards bearing the names of persons on the jury roll, into the jury box, and the resultant composition of said jury box, from which the names of jurors were drawn at random by a circuit judge to constitute (1) venire from which names of the grand jury that indicted defendant were drawn at random by a circuit judge and (2) the names that were drawn at random therefrom to form the venire of the petit jury from which the jury that tried defendant was selected. Appellant contends that as to (1) the court erred in denying the defendant's "motion to quash the grand jury venire which returned the indictment against him." As to (2), appellant says that the court erred in denying defendant's motion to strike the "petit jury venire or in the alternative continue the trial of the cause pending the implementation of a new jury act," Acts 1978, Regular Session, No. 594, p. 712 et seq., approved April 27, 1978.
As to (1), appellant concedes that the issue has been determined adversely to him in Oyarzun v. Pittman, Ala.Cr.App.,367 So.2d 574, cert. denied, Ala., 367 So.2d 584. In Oyarzun, the appellant was one of approximately ten individuals who had been arrested for and charged with the possession of a large amount of marijuana that formed the basis of the prosecution in the instant case.
It was held in Oyarzun that he was not entitled to a judgment in his favor on his petition for a writ of mandamus against the clerk, chairman and members of the Baldwin County Jury Commission, alleging that they had failed to carry out their duties as to the jury roll and filling the jury box with the names of proper prospective jurors. By agreement of the parties in this case and in Oyarzun, the motion in this case, as to the grand jury that indicted this appellant, and the petition for mandamus in Oyarzun were consolidated for the purpose of a hearing of both, which was conducted and which included a large amount of evidence. The parties herein have stipulated that the transcript of the evidence in Oyarzun shall be considered as if it were a part of the transcript in this case. We adhere to the conclusion reached therein, and we see no good reason to supplement, or otherwise change in any way, the opinion inOyarzun v. Pittman, supra.
As to (2), it necessarily follows, we think, that what was held in Oyarzun is applicable, except as the question may be affected by the provisions of Acts 1978, Regular Session, No. 594, which was enacted subsequent to the hearing by the trial court of the petition for mandamus in Oyarzun and made material changes in the preexisting statutory law as to "County Jury Commissions" throughout Alabama. According to Acts 1978, No. 594, it became effective on the date of its approval, April 27, 1978.
One of a number of major changes in the law made by Acts 1978, No. 594, was that the jury box, called the "master jury box," to distinguish it from the "trial court jury box" to be maintained by the jury commission, was not required to be filled with the names (cards) of all of the persons on the county jury roll or "list," as the same is called by Acts 1978, No. 594. Section 4 of said Act provides in detail for the number and the percentage "of the total number of names on the master list" to be placed in the master jury box and a formula for computing how many go into the box so as to further secure the selection "at random from a fair cross section" of the area affected and "the opportunity" of residents thereof "to be considered for jury service," as expressed in Section 1 of the Act. See also ARJA Rule 46 as to the formula.
In pressing his contention that the court erred in denying defendant's motion to strike the "petit jury venire or in the alternative continue the trial of the cause pending the implementation of the new jury act," appellant relies heavily upon the following provision of § 4 (b) of the Act:
 "In July of each even-numbered year, the master jury box shall be emptied and refilled as herein prescribed." *Page 222 
Defendant's motion "to strike venire of petit jurors . . . or in the alternative to continue" the cause was filed on July 21, 1978. The case was then set for trial for July 31, 1978, after one or more continuances at the request of the defendant. The motion was heard on July 24.
The hearing on the particular motion was replete with evidence of the utter impossibility of an instantaneous metamorphosis from the established procedure prior to April 27, 1978, to the procedure enacted by Acts 1978, No. 594. It became apparent that in Baldwin County, as well as in other counties of the State, a conversion from one procedure into the other would require considerable time, so much, that to have suspended the trial of jury cases during all of that time would have seriously impaired the administration of justice, jeopardized the right of the accused in criminal prosecutions to a speedy trial and would have collided with the spirit and beneficent policy of Acts 1978, No. 594. In recognition of the impossibility of a compliance with the spirit of the new law, the Legislature by Acts 1978, 2d Ex.Sess., No. 14, § 1, on August 7, 1978, changed the date for emptying and refilling the box from July 31, 1978, to December 31, 1978.
The evidence as a whole on the hearing of the motion to strike the petit jury venire shows that the jury commission and its employees had pursued substantially the same procedures it had previously followed except as they were augmented by its efforts, and they were many, to bring about a compliance with Acts 1978, No. 594 and a complete compliance therewith as soon as practicable. Some claimed irregularities were emphasized by defendant, and we cannot say that some irregularities did not exist, but we find none that are materially significant or that constitute a violation of any constitutional right of defendant. The claimed irregularities are of the same nature as the claimed irregularities that were thoroughly considered and correctly determined, in our continuing opinion, by Judge DeCarlo in Oyarzun v. Pittman, supra. The motion of defendant to strike the petit jury venire or in the alternative to grant defendant a continuance was properly overruled.
The series of incidents that formed a basis for the prosecution in the instant case, as well as the prosecutions against nine other individuals, transpired during the last few days and nights of 1977, particularly but not exclusively December 30 and December 31. The indictment of the defendant herein was returned on January 11, 1978. The controlled substance to which the word "marihuana" in the indictment is referable, consisted of twelve bales thereof with a total weight of 4,450 pounds in the stage of "green vegetable material."
For a few days before December 31, 1977, there had been a joint investigation, covering the area of Baldwin County surrounding the place where the marihuana was found and seized, conducted by law enforcement officers of Alabama Bureau of Investigation, United States Customs Service, Alabama Beverage Control Board and Baldwin County Sheriff's Department. It pertained to suspected unlawful activities on water and on land between Ft. Morgan, Alabama, and its environs, and the Alabama-Florida boundary near its southern end, and resulted in the discovery and seizure, in the early daylight hours of January 31, of the marihuana, on board a vessel that had been traced upon its entry from the Gulf of Mexico to where it had been moored and abandoned by its occupants at Bear Point Marina. The vessel was consistently referred to in the evidence as a "sailboat" by the name of "Cher."
The Cher had been preceded at varying distances by a pleasure yacht by the name of "Island Girl" from the Ft. Morgan area to the area of the Bear Point Marina. It then went only a short distance farther in a generally easterly direction and stopped without coming to land. Soon thereafter, both of the vessels were boarded by some of the law enforcement officers. Those boarding the Cher found the marihuana; those boarding the Island Girl found no marihuana or other controlled substance. On the Island Girl were the defendant (appellant) and another man. They were both arrested *Page 223 
on the occasion. On the same occasion, persons who had landed from the Cher were arrested; soon thereafter the marihuana was discovered, and all arrested, including defendant (appellant), were transported to the Baldwin County Jail.
On January 23, 1978, defendant filed a motion for the "suppression of evidence seized by officers without search warrant or warrant of arrest." The motion expressly embraced "papers, documents, vehicles, boats, controlled substances, marijuana, firearms, and any other evidence derived from the stake out, observation, investigation, and arrest of the Defendant on the charge of Possession of Marijuana, a felony." It appears that the motion was consolidated for the purpose of the hearing with motions to suppress filed by nine other defendants indicted in connection with the alleged possession of the marihuana, which hearing was conducted on February 14, 15, 16 and 17, 1978. Much of the evidence, consisting of a transcript of over 450 pages, pertained to appellant herein, but much more of it pertained to the other persons, separately indicted, including those who had been on the Cher, with little, if any, relevance to the motion of the appellant herein. Having in mind that appeals from any convictions in the other cases require separate consideration, we carefully refrain herein from considering any issues arising exclusively in any of such cases.
Appellant asserts as error the denial of his motion to suppress and the denial of his motion to exclude the evidence when the State rested. No evidence was presented by defendant on the trial of the case.
We think it unnecessary to discuss some parts of the evidence that the State contends served to connect defendant with the possession of the marihuana, such as his having been observed by some of the officers on occasions within a week before December 31, 1977, in Gulf Shores and near the Alabama-Florida boundary, for the reason that this opinion would be unduly extended thereby and the circumstances now summarized herein as to what occurred on the night of December 30-31 are sufficient to show that the court was not in error in denying defendant's motion to suppress or in overruling defendant's motion to exclude the evidence.
About nine or nine-thirty P.M. December 30, 1977, the Island Girl was observed by one of the officers testifying leaving Bear Point Marina and proceeding west along the long and winding intercoastal waterway toward Ft. Morgan. It was thereafter followed by U.S. Customs Supervisory Patrol Officer Joe McKnight and A.B.C. Agent Aubrey Little, in an open fishing boat, at Gulf Shores, who maintained visual surveillance of the Island Girl by means of its running lights to a point approximately two miles east of Ft. Morgan, a total distance of about thirty miles from Bear Point Marina. Meanwhile, according to the testimony of U.S. Customs Agent Jim Moree, he and Mr. Forrest Robinson went to Mobile, obtained a U.S. Customs boat and brought it alongside Agent Little's boat, where it was boarded by S.P.O. McKnight, who commenced and maintained surveillance of Island Girl by radar on the customs boat. Also in the meantime, U.S. Customs Agent Reggie Montgomery and Officer Roland Howell of the Baldwin County Sheriff's Department paralleled largely the travel of the Island Girl and each of the boats following it by their movement on motor vehicles along the highway on the Baldwin County Peninsula between Gulf Shores and Ft. Morgan. Agent Montgomery viewed the Island Girl with binoculars from the end of the pier at the end of the peninsula at Ft. Morgan. He observed what was afterwards determined to be the Cher coming from the Gulf of Mexico.
According to the testimony of S.P.O. McKnight, after he had commenced radar surveillance of the Island Girl he observed by radar the sailboat, afterwards determined to be the Cher, and noticed that it "left our location and headed on a straight line toward the blip we had established as being the Island Girl." He further testified:
 "After the light flashed, the boat moved away from where our boat was, and traveled *Page 224 
to a point to a quarter of a mile from the position the Island Girl was in. At this time the Cher gave another flash of deck lights, turned them off, the Island Girl, after a few seconds and flashed back to the sailboat with a spot light or something. We were unable to determine what. Again the Cher turned on its deck lights and again another flash of lights from the Island Girl. At this time they both proceeded eastbound in the intercoastal back towards the Gulf Shores area.
"MR. HENDRIX:
"Q. Which boat was in the lead?
"A. The Island Girl.
 "Q. Approximately how far behind the Island Girl did the Cher follow?
 "A. The Cher varied its distance anywhere from a quarter mile to half mile. Most of the time a quarter mile distance between the two.
 "Q. How far did you maintain your distance between you and Cher?
 "A. Ours also varied as to traffic conditions — light tugboat traffic in the Intercoastal. But we stayed a maximum of two miles all the time.
"Q. Did you have them on radar at that time?
"A. Yes, sir."
On cross-examination his testimony continued as follows:
 "Q. Could you tell us, sir, when you saw the two boats meet, what do you mean by them meeting?
 "A. They came to a point one-quarter mile apart, and light signals were observed from each boat. And they simultaneously started their movements to the east, and maintained the same distance between them all the way for the entire thirty miles.
 "Q. Okay. First of all, they did not come in direct proximity with each other, did they?
"A. They did not touch each other.
"Q. There was a quarter of a mile between them?
"A. Yes, sir.
". . . .
 "Q. I see. Are you familiar with the position in which the Island Girl was when the Cher came to rest at some area near the Island?
". . . .
 "A. The Island Girl, when the Cher went into the cut of land — Pirates Cove, the Island Girl remained in the intercoastal approximately a half mile to a mile from that place. It was just east of where the Cher left the intercoastal to go into that point of land. The Island Girl continued to a point just east of that and idled into the Intercoastal Canal."
SPO McKnight testified further that he was among those who boarded the Cher and found the bales of marihuana thereon.
Agent Aubrey Little of the Alabama Bureau of Investigation, (Public Safety) testified that he, with a deputy sheriff and an officer of U.S. Customs boarded the Island Girl soon after it was stopped as heretofore stated and saw the defendant as they boarded it, who identified himself by name and stated that he was the captain of Island Girl. Another man was on the boat with him.
The hearing of the broadside motion for the suppression of evidence "consisting of papers, documents, vehicles, boats, controlled substances, marihuana, firearms, and any other evidence" failed to develop any evidence of major importance on the question of the guilt or innocence of defendant other than the marihuana found on the Cher. As to the suppression of that evidence, appellant is without standing. There is nothing in the record or the transcript to indicate that he owned the Cher or had any legal right to possess or control it. The only evidence as to his connection with it is that which shows his connection with the contraband it was transporting. By his plea of not guilty, he denies such a connection. His position in so doing and claiming an interest in the Cher that would entitle him to the benefit of constitutional protection against an unreasonable search and seizure of the Cher is duplicitous. We refrain at this time from going into the question *Page 225 
of whether separately indicted codefendants would come under such umbrella, but he did not, according to the record and transcript in this case. Furthermore, whatever interest he had in the marihuana, which the jury by its verdict decided that he had, would not be sufficient to show that the Cher, or that which was searched or seized on the Cher other than the marihuana, was one of his "houses, papers, and [or] effects" as to which the Fourth Amendment to the Constitution of the United States affords security. Evidence as to a pistol found on the Island Girl was of no consequence, had no material bearing on the issue of guilt or innocence of the defendant and would not have been of any substantial injury to him, even if any objections of defendant justified a ruling in favor of the defendant as to the particular evidence.
Appellant further contends as a basis for his motion to suppress that defendant was arrested without probable cause. We do not agree, but, even so, this would not render inadmissible any of the evidence as to the marihuana and defendant's connection therewith, unless such evidence had become poisoned by the arrest of defendant. The arrest of defendant and the location of the marihuana on the Cher were closely related in point of time and place, and in the events that had transpired prior to the return of the two boats to the area of Pirates Cove, but there was nothing in the arrest of defendant on the Island Girl that proximately caused or contributed to the boarding of the Cher and the location thereon of the marihuana.
It should be said also that a United States Customs officer was among the officers that boarded each of the vessels and that 19 U.S.C.A. § 1581 (a) provides:
 "Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters, or as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703-11 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect and search the vessel or vehicle and every part thereof and any persons, trunk, package or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance."
The witnesses for the State were vigorously and comprehensively cross-examined by attorneys for the defendant. Their testimony was screened for circumstances that tended to show the possibility of defendant's innocence, and some were found. One was evidence that permitted an inference that the Island Girl was having engine trouble as it returned to the general area where the Island Girl and the Cher finally stopped, and were boarded by law enforcement officers, and that the engine trouble explained the stopping of the Island Girl as merely approximately coincidental with the landing of the Cher. Even so, there is little reasonable basis for any claim that the meeting between the Island Girl and the Cher at Ft. Morgan as they came from long, diverse paths, the then exchange of signals between them, and the immediate reversal by the Island Girl of the course it had previously taken and its conduct as a pilot or guide to the course taken by the Cher for a distance of approximately thirty miles, the vessels going at approximately the same speed all the time, were merely coincidental. The possibility of defendant's innocence is not disproved by the circumstances, but they are much more consistent with his guilt than his innocence. They furnish substantial evidence that he was guilty as charged in the indictment of the possession of marihuana, either as a principal or a fortiori as an aider or abettor. The trial court was not in error in denying his motion to exclude the evidence.
By saying that the trial court "erred in instructing the trial jury with respect to the law of this State concerning conspiracy," appellant makes a point that conspiracy is a separate and distinct offense, covered by Code 1975, §§ 13-9-20 through 13-9-25. He is correct in his view *Page 226 
that conspiracy as an inchoate crime is a distinct, substantive offense, separate and apart from the consummated crime contemplated by the conspirators. Smith v. State, 8 Ala. App. 187,62 So. 575 (1913). He is incorrect, however, in his apparent contention that the word "conspire" or "conspiracy" has no proper place in a court's oral charge to the jury as to the law relative to criminal liability of a defendant as an aider, abettor or accomplice of a principal in the commission of a crime. As stated in Smith v. State, supra, at 62 So. 577-578:
 "When an act, however, has been committed by one of the conspirators in furtherance of the common design, if the act amounts only to a misdemeanor, then all of the conspirators may be indicted and tried either for the conspiracy to commit the act or for the act itself; but, when the act done in such furtherance amounts to a felony, then the lesser offense of the conspiracy to do the act is merged into the higher crime of the act itself, and the conspirators can only be indicted for and convicted of the latter — all as principals under the statute. 6 Am. 
Eng.Ency. Law, p. 863. The rules of evidence, however, applicable to the establishment of a conspiracy, are the same, of course, whether the parties are charged and being tried for the conspiracy itself or for the crime committed in execution or attempted execution of it."
There are times, perhaps, when it would be better in cases in which a defendant is on trial as an aider or abettor of a principal of a crime, that the word "conspire" and any derivative thereof not be used in instructions to the jury, so as to avoid thereby any confusion on the subject, but we find no basis for any confusion to the prejudice of the defendant in the use of such expressions in the oral charge in the instant case. Nevertheless, after an exception taken by the defendant, the trial court said:
 "Well, if there is any question about it — Ladies and gentlemen, you strike from your mind any charge I made concerning conspiracy.
 "And I charge you this again: If you are satisfied beyond a reasonable doubt that there was an agreement or joint venture between this defendant or one or more persons to violate the laws of the State of Alabama, that the laws of the State of Alabama were violated, in that he did possess marihuana or aided and assisted in the possession of marihuana, and that the possession was either a direct possession, that he had it in his control or it was in his constructive possession, as I have defined it to you heretofore, the form of your verdict would be: `We the jury find the defendant guilty.'
 "MR. CARLTON: [Defendant's attorney]: We would object to the charge and move for a mistrial.
"THE COURT: Deny the motion."
The action of the trial court as to the subject of conspiracy in its oral charge was not erroneous.
During the testimony of Chief Deputy Sheriff Anderson on the trial of the case, two nautical charts, State's Exhibits 2 and 3, taken off the Island Girl on the morning of December 31, 1977, were admitted in evidence over the objection of defendant. In making the objection, counsel for defendant said, inter alia:
 "I would further make objection on the grounds that these items were seized without benefit of a warrant, and that the State — not the State, but rather the officers had no right to board the Island Girl at that particular time, as there was no allegation this was part of any inventory. Assuming that an inventory would even be proper, and as I suggest, it wouldn't be, as a fruit of a poisonous tree in our motion to suppress. They had no right to board in the first place. But this boarding was at a time they could have secured a search warrant, and did not secure a search warrant but merely went on board and removed therefrom allegedly these charts that are the subject matter of a potential Exhibit."
Appellant asserts that the admission in error of the charts was erroneous. The transcript shows that these exhibits were not among any items discovered on the Island *Page 227 
Girl on the occasion of its being boarded by law enforcement officers and the defendant and his companion were arrested. It was some two hours after that, after defendant and others had been taken to jail and after the marihuana on the Cher had been taken therefrom and loaded on a trailer to be transported to the jail at Bay Minette. At the time Deputy Anderson first saw the charts, he had gone on the Island Girl to supervise or assist the officers already thereon in the process of making an inventory of the contents of Island Girl, that were to be taken therefrom for the usual purposes of a legal inventory of property to be placed in the custody of law enforcement officers that had recently been in possession of persons who by reason of their arrest and imprisonment were no longer able to safeguard the property from theft, despoliation or destruction. An inventory under such circumstances does not constitute a violation of Fourth Amendment rights. South Dakota v. Opperman,428 U.S. 364, 367, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000
(1976); Wilkinson v. State, Ala.Cr.App., 374 So.2d 396, 398
(1979), cert. denied, Ala., 374 So.2d 400 (1979). Some years before the pronouncement by the Supreme Court in South Dakotav. Opperman, supra, it was stated in United States v. Gravitt,484 F.2d 375, 378 (5 Cir. 1973), cert. denied, 414 U.S. 1135,94 S.Ct. 879, 38 L.Ed.2d 761 (1974):
 "This Court has consistently recognized that the fourth amendment is not violated when the police take custody of the property of persons they arrest to store that property for safe keeping. United States v. Rosenberg, 5 Cir. 1972, 458 F.2d 1183; United States v. Boyd, 5 Cir. 1971, 436 F.2d 1203; United States v. Lipscomb, 5 Cir. 1971, 435 F.2d 795. In those, and other cases that might be cited, we recognized that when the police take custody of any sort of container — be it an automobile, suitcase, or any other thing in which property may be stored — it is reasonable to search the container to itemize the property to be held by the police. Boyd, 436 F.2d at 1185; Lipscomb, 435 F.2d at 800-801. These decisions reflect, of course, the underlying principle that the fourth amendment proscribes only unreasonable searches. Lipscomb, 435 F.2d at 800 citing Terry v. Ohio, 1968, 392 U.S. 1, 9, 88 S.Ct. 1868, [1873], 20 L.Ed.2d 889, 899. In Lipscomb we articulated the considerations underlying the view that custodial seizures and accompanying inventory searches are reasonable:
 "It cannot be denied that to prevent escape, self-injury, or harm to others, the police have a legitimate interest in separating the accused from the property found in his possession. An inventory is then necessary both to preserve the property of the accused while he is in jail and to forestall the possibility that the accused may later claim that some item has not been returned to him.
"435 F.2d at 800."
In addition to defendant's grounds for objections to the introduction of State's Exhibits 2 and 3, indicated above, defendant asserted grounds to the effect that the chain of custody as to the exhibits had not been shown, that there had been some alteration of the designation or number of each of the items, and other handwriting thereon, and that they were not produced at the hearing on defendant's motion to suppress the evidence. The transcript shows that after the admission of the exhibits in evidence, the witness was subjected to extensive and intensive cross-examination by defendant in which he was interrogated as to all of the matters embraced in such grounds of objection. No further ruling as to the admissibility of the evidence was ever invoked. Our conclusion is that the chain of custody was shown, there had been no material change in the exhibits subsequent to their discovery on the Island Girl and that there had been no intentional withholding of them from the hearing on the motion to suppress, which may have been, as appellant asserts, considered by all concerned as including a pretrial motion to produce. The trial court was not in error in admitting in evidence State's Exhibits 2 and 3. *Page 228 
In two separate sections of his brief and argument, one captioned "Prejudicial Comments and Remarks" and the other captioned "Prejudicial Comments," appellant presents some distinct issues as to the action of the trial court in overruling certain objections, motions to exclude or "to disregard" remarks, or motions for a mistrial interposed by defendant. We now treat each one separately.
During the first part of the direct examination of Agent Little of the Alabama Bureau of Investigation, the following occurred:
 "Q. Did you, during that time, investigate a marijuana case at Bear Point?
 "MR. CARLTON: Object and move to strike and ask the court to instruct the jury to disregard that.
 "MR. TAYLOR: And Judge, we specifically address our objection to the form of the question. `Investigating the marijuana case.' We object to that unless there is some connection with our client as to what case he investigated.
"THE COURT: Say alleged case.
 "MR. HENDRIX: If I don't tie it up — it doesn't matter what I say unless I hook into it.
 "MR. CARLTON: Excuse me. I object and ask the court to instruct the jury to disregard his remarks. That is not the purpose of a trial. . . .
 "MR. HENDRIX: That is not what I meant. If he interpreted that way, that's not what I meant.
"THE COURT: Go ahead and ask your question.
"MR. HENDRIX:
"Q. Do you know the Defendant, Daniel P. O'Leary?"
In support of his contention that the trial court committed error in connection with the portion of the transcript quoted above, appellant "asserts that the Trial Court erred in failing to sustain an objection to a statement made by the prosecutor that `If I don't tie it up — it doesn't matter what I sayunless I hook him to it.'" Appellant then "submits that the statement was made merely for the purpose of prejudicing the Defendant in the mind of the jurors." If such was the intention of the attorney for the State, it is not obvious to us. It is obvious that the expression "hook him to it" could have conceivably had a tinge of sharpness that should have been avoided by one of the more conventional applicable expressions, such as "connect it" or "tie it up," but we are not convinced the words chosen were "merely for the purpose of prejudicing the Defendant in the minds of the jurors." Furthermore, the prompt disavowal of any intention to convey the thought that defendant's counsel deemed that the language possessed should have removed any possible sting that could have occurred. The trial court evidently so considered it by stating, "Go ahead and ask the question." Defendant seemingly saw no reason then to insist on the ruling that he invoked prior to the disavowal by counsel for the State. We find no error in the action of the trial court as to the incident.
During further direct examination of Agent Little as to what took place and what was observed as he joined other law enforcement officers on the Island Girl on the morning of December 31, 1977, the following occurred:
"Q. Did you find a weapon on board?
 "MR. TAYLOR: Objection, it's irrelevant and immaterial. It's irrelevant and immaterial to this defendant.
 "MR. CARLTON: If Your Honor please, it's being brought up for the purpose of merely inflaming the jury. It has nothing to do with this charge at all or any other charge.
"THE COURT: I overrule the objection.
 "MR. HENDRIX: Did you ask the defendant if he had any weapons on board?
"MR. TAYLOR: We object.
"THE COURT: Overrule the objection.
 "THE WITNESS: May I ask both of them if there was any weapons on board.
"Q. Who answered?
"A. I don't know who answered.
"Q. Did you find a weapon?
"A. Yes, sir.
"Q. What did you find? *Page 229 
 "MR. TAYLOR: We object to it on the grounds previously stated.
"THE COURT: Overrule.
"THE WITNESS:
"A. A pistol.
"Q. Did you take it into your possession?
"A. I gave it to Deputy Howell.
 "Q. And then the boat was moved around to where the sailboat was?
"A. Yes sir."
Appellant briefly argues that such "testimony had nothing to do with the charge against the Defendant and the appellant respectfully asserts that the testimony was elicited for the mere purpose of inflaming the jury." We agree with the first part of appellant's quoted argument to the extent that the evidence as to a pistol being on board standing alone had little, if any, material bearing on the issue as to defendant's guilt or innocence, but we are not persuaded that such circumstance, when considered with all of the other ramified circumstances, was subject to the general objection. As to the second part, that the testimony was "elicited for the mere purpose of inflaming the jury," we are not in agreement, as we see little, if anything, that could be inflammatory about finding a pistol on a yacht such as the Island Girl that had been traveling up and down the intercoastal waterway almost all night, with only two men on board. It is to be noted that the objection made is unrelated to the question otherwise raised and considered as to any violation of one's right to security against searches and seizures. We do not agree with appellant's concluding statement on the point that "Testimony of this type was condemned in Mitchell v. State, 50 Ala. App. 121,277 So.2d 395, cert. denied, 291 Ala. 794, 271 [277] So.2d 401 [404] (1973)." The reference is to what was stated at 277 So.2d p. 400:
 ". . . We do not sanction the procedure pursued by the state in this case in referring to six pistols with knowledge that the death weapon had not been found. The six pistols constituted a `courtroom arsenal' and had no place in the trial of this case. . . . Had the motion to exclude been limited to all testimony relating to all pistols but the Clark pistol, it would have been reversible error to have overruled the motion."
In Mitchell, the "Clark pistol" was the pistol of the victim in the murder case involved. It was relevant to show, according to the evidence, that it was not the pistol that fired the bullet that penetrated the head of the victim and killed him. Only two shots were fired at the time of the fatal encounter. The pistol that killed the decedent was never found; the other pistols had no bearing whatever on any issue in that case. In this case there was no harmful error in overruling defendant's objections as to the evidence as to the pistol that was admitted.
During the direct examination of U.S. Customs Supervisory Patrol Officer McKnight as to his boarding the Cher on the morning of December 31, 1977, the following occurred:
 "A. We suspected that the boat was loaded with marijuana.
"MR. CARLTON: I move to exclude his answer.
 "THE COURT: All right. I direct the jury to strike the witness' answers from their minds. What did you base your suspicions on? The actions of the boat?
 "THE WITNESS: Yes, sir, the actions of the boat and the profile that a number of other cases had followed.
"MR. TAYLOR: We object to the profile in other cases.
"THE COURT: Overrule the objection.
 "MR. CARLTON: I would at this time rule [sic] for a mistrial based on the other cases unrelated to this Defendant.
 "THE COURT: All right. Just confine it to the actions of these vessels.
"MR. TAYLOR: Has Your Honor ruled?
"THE COURT: I deny your motion.
"THE WITNESS: We suspected from the boat's action —
 "MR. TAYLOR: Your Honor, we object to the term `We', we want to know about his personal reasons.
 "THE COURT: I think he is trying to tell you. Overrule your objection. *Page 230 
"MR. TAYLOR: We except.
 "THE WITNESS: Okay. I suspected the boat would possibly be loaded with marijuana on the actions and the way it came in at night and the way it had been met by another boat and led into another case area."
It is to be seen from the quoted portion of the transcript that that portion of the answer of the witness as to the "profile that a number of other cases had followed" was held in effect to be inadmissible, as found in the court's instruction to the witness, "Just confine it to the actions of these vessels." This the witness thereafter did. As to the particular matter, defendant's objection came after the witness had answered, and he did not move to exclude the objectionable part of the answer but moved for a mistrial by reason thereof. There may have been no definite meeting of the minds of the court and defendant's counsel on the subject, but we believe it to be reasonably clear, and that it was clear to the jury, that the objectionable part of the statement of the witness was not in evidence for consideration of the jury. Whether so or not, the incident did not give rise to a meritorious motion for a mistrial. We find no error prejudicial to defendant as to the matter.
On two occasions during the trial, the State injected into the case the matter of the authority of officers of U.S. Customs Service, one during the testimony of Supervisory Patrol Officer McKnight and the other during the testimony of Officer Moree, both officers of the U.S. Customs Service. The questions pertained to their authority to board vessels in coastal waters of the United States. Grounds of objection were to the effect that their testimony would contain opinions or conclusions of law that were for the court, and the court only, to decide. The transcript shows the following during the direct examination of Officer McKnight:
 "Q. Is it a custom, do you have authority to board vessels at any time?
 "MR. TAYLOR: I object. We object, that calls for a legal opinion of the person.
"THE COURT: Overrule the objection.
"MR. TAYLOR: We except.
"THE WITNESS:
"A. Yes sir, Nineteen, U.S. Code —
 "MR. CARLTON: We will move to exclude the answer as being unresponsive. It's a question of law and we contend he does not have the authority to board under the circumstances as he has testified.
"THE COURT: Deny your motion.
 "THE WITNESS: That is the authority and that is the reason that I boarded the vessel at that time, yes sir."
The witness thereafter proceeded to testify as to boarding the Cher and finding the marihuana thereon. We see no need to quote the more extensive part of the transcript wherein Officer Moree was questioned over the objections of defendant as to his boarding the Cher and his legal authority for doing so.
Appellant cites in support of his contention Fiorella v. Cityof Birmingham, 35 Ala. App. 384, 48 So.2d 761, cert. denied,254 Ala. 515, 48 So.2d 768, cert. denied 340 U.S. 942,71 S.Ct. 506, 95 L.Ed. 680 (1950). We do not disagree with appellant's contention as to the general inadmissibility of such evidence, but as pointed out heretofore, this defendant had no standing to question the legality of the search and seizure made on the Cher. It may well be that the excursion by the State into the area of the legal authority of the witnesses, which was a matter for the court and not the jury to decide, was prompted to some extent by defendant's theme throughout the case to the effect that the officers had no right to board either vessel, but whether so or not we do not find reversible error in the action of the court in overruling defendant's objections to it, for the reason that it was entirely innocuous.
During the opening argument to the jury of counsel for the State, we find the following argument, objection and motion of defendant and ruling of the court:
 "He [attorney for defendant] is going to talk to you about engine trouble, and that's probably the reason she [Island *Page 231 
Girl] was lying dead in the water out there was because of engine trouble. I don't know how long the engine trouble was going on. There is no evidence of that — Whether it had just started going on for several weeks. . . .
 "MR. CARLTON: Excuse me. But I would object and move for a mistrial predicated on the statement counsel. We have no evidence of that as the defendant is under no obligation to present any evidence whatsoever. And I would make further objection, which I would like to make out of the presence of the jury.
"(Pause)
 "MR. CARLTON: Well, the jury doesn't have to be taken out. I can come closer.
"(SIDE BAR).
 "MR. CARLTON: Your Honor, my objection is that that statement that we have no evidence of that, referring to the engine trouble, is a comment on the failure of the defendant to testify — That if he had testified he could have explained how he had been having engine trouble. And I think that is a reversible error and move for a mistrial.
"THE COURT: Deny the motion."
An analysis of the argument, the objections and motions of defendant, and the ruling of the court leads us to the conclusion that the principal, if not the exclusive, target of the objections and motion was the last sentence of the quoted argument, "There is no evidence of that — Whether it had just started going on for several weeks," and the contention of appellant seems to be directed chiefly, if not solely, to such sentence. In support of his contention, appellant relies uponBeecher v. State, 294 Ala. 674, 320 So.2d 727 (1975). Appellant expressly contends "That the challenged statement of the prosecutor gave rise to the distinct possibility that the jury would understand the statement as a comment on the Defendant's failure to testify and that the trial court should have granted the motion for mistrial or attempted to cure the error by appropriate curative instructions." The statement of counsel for the State in the instant case is essentially different from the statement that was the subject of the issue determined inBeecher v. State. The statement there was, "No one took the stand to deny it." The "it" referred to an item that was in the evidence. In the instant case, there was no reference whatever to the failure of anyone to take the stand, no reference to the failure of anyone to deny or dispute any evidence that was in the case. The statement could not be interpreted as being any more critical of the defendant than of the State. It is impossible for us to say what was in the mind of counsel for the State at the time he was interrupted therein by the objection, but at that time it is clear that his statement was subject to the only reasonable construction that the jury was being asked to take the evidence as it was, and not to speculate on what it could have been, as to the duration of the engine trouble. If defendant's counsel correctly anticipated that the State's counsel would inject the failure of any person or persons to testify as to the duration of the engine trouble, he succeeded in forestalling such improper argument, by his interruption of the argument of counsel for the State. It should be kept in mind that with the close surveillance of the Island Girl maintained by law enforcement personnel up and down the thirty-mile stretch of the intercoastal canal, some of them could have shown, if it was true, that no appreciable engine trouble of the Island Girl had been manifested, but in commendable candor, State's counsel disavows any such contention by saying, "I don't know how long the engine trouble was going on."
Perhaps the whole matter could have been clarified by an in depth conference, which was hardly possible by the "SIDE BAR" conference that transpired, but no one is to be blamed in that respect. The trial court was not in error in denying defendant's motion for a mistrial. It would not have been appropriate, we think, for the court to have sua sponte taken any action other than it did in calmly denying defendant's motion for a mistrial. In the argument quoted, we find that there was no comment on the failure of the defendant to testify. Luker v. State, Ala.Cr.App., 358 So.2d 504 (1978). *Page 232 
We have searched the extraordinarily voluminous record in this case for error prejudicial to defendant and have found none. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.