O'Leary's conviction for possession of marijuana is here for review after we issued the writ of certiorari to the Court of Criminal Appeals the second time.
That appellate court, 417 So.2d 214 initially reversed the conviction on the basis that the record did not disclose a proper arraignment. At the behest of the State, we granted certiorari to review that holding and reversed that court regarding arraignment. We remanded for further proceedings,417 So.2d 217. On remand, the Court of Criminal Appeals decided the remaining issues adversely to defendant and affirmed his conviction. Now defendant challenges that court's latter decision.
The pertinent underlying facts are summarized in the opinion of the Court of Criminal Appeals, O'Leary v. State, [Ms. June 23, 1981] 417 So.2d 219 (Ala.Cr.App. 1981), as follows:
 "The series of incidents that formed a basis for the prosecution in the instant case, as well as the prosecutions against nine other individuals, transpired during the last few days and nights of 1977, particularly but not exclusively December 30 and December 31. . . .
". . . .
 "For a few days before December 31, 1977, there had been a joint investigation, covering the area of Baldwin County surrounding the place where the marihuana was found and seized, conducted by law enforcement officers of Alabama Bureau of Investigation, United States Customs Service, Alabama Beverage Control Board and Baldwin County Sheriff's Department. It pertained to suspected unlawful activities on water and on land between Ft. Morgan, Alabama, and its environs, and the Alabama-Florida boundary near its southern end, and resulted in the discovery and seizure, in the early daylight hours of January 31 [sic], of the marihuana, on board a vessel that *Page 234 
had been traced upon its entry from the Gulf of Mexico to where it had been moored and abandoned by its occupants at Bear Point Marina. The vessel was consistently referred to in the evidence as a `sailboat' by the name of `Cher.'
 "The Cher had been preceded at varying distances by a pleasure yacht by the name of `Island Girl' from the Ft. Morgan area to the area of the Bear Point Marina. It then went only a short distance farther in a generally easterly direction and stopped without coming to land. Soon thereafter, both of the vessels were boarded by some of the law enforcement officers. Those boarding the Cher found the marihuana; those boarding the Island Girl found no marihuana or other controlled substance. On the Island Girl were the defendant (appellant) and another man. They were both arrested on the occasion. On the same occasion, persons who had landed from the Cher were arrested; soon thereafter the marihuana was discovered, and all arrested, including defendant (appellant), were transported to the Baldwin County Jail."
At a further point in the opinion, there appears a more detailed statement of the surveillance of the two vessels by law enforcement officers. It reads:
 "About nine or nine-thirty P.M. December 30, 1977, the Island Girl was observed by one of the officers testifying leaving Bear Point Marina and proceeding west along the long and winding intercoastal [sic] waterway toward Ft. Morgan. It was thereafter followed by U.S. Customs Supervisory Patrol Officer Joe McKnight and A.B.C. Agent Aubrey Little, in an open fishing boat, at Gulf Shores, who maintained visual surveillance of the Island Girl by means of its running lights to a point approximately two miles east of Ft. Morgan, a total distance of about thirty miles from Bear Point Marina. Meanwhile, according to the testimony of U.S. Customs Agent Jim Moree, he and Mr. Forrest Robinson went to Mobile, obtained a U.S. Customs boat and brought it alongside Agent Little's boat, where it was boarded by S.P.O. McKnight, who commenced and maintained surveillance of Island Girl by radar on the customs boat. Also in the meantime, U.S. Customs Agent Reggie Montgomery and Officer Roland Howell of the Baldwin County Sheriff's Department paralleled largely the travel of the Island Girl and each of the boats following it by their movement on motor vehicles along the highway on the Baldwin County Peninsula between Gulf Shores and Ft. Morgan. Agent Montgomery viewed the Island Girl with binoculars from the end of the pier at the end of the peninsula at Ft. Morgan. He observed what was afterwards determined to be the Cher coming from the Gulf of Mexico.
 "According to the testimony of S.P.O. McKnight, after he had commenced radar surveillance of the Island Girl he observed by radar the sailboat, afterwards determined to be the Cher, and noticed that it `left our location and headed on a straight line toward the blip we had established as being the Island Girl.' He further testified:
 "`After the light flashed, the boat moved away from where our boat was, and traveled to a point to a quarter of a mile from the position the Island Girl was in. At this time the Cher gave another flash of deck lights, turned them off, the Island Girl, after a few seconds and flashed back to the sailboat with a spot light or something. We were unable to determine what. Again the Cher turned on its deck lights and again another flash of lights from the Island Girl. At this time they both proceeded eastbound in the intercoastal [sic] back towards the Gulf Shores area.
"`MR. HENDRIX:
"`Q. Which boat was in the lead?
"`A. The Island Girl.
 "`Q. Approximately how far behind the Island Girl did the Cher follow?
 "`A. The Cher varied its distance anywhere from a quarter mile to half mile. Most of the time a quarter mile distance between the two.
 "`Q. How far did you maintain your distance between you and Cher? *Page 235 
 "`A. Ours also varied as to traffic conditions — light tugboat traffic in the Intercoastal [sic]. But we stayed a maximum of two miles all the time.
"`Q. Did you have them on radar at that time?
"`A. Yes, sir.'
 "On cross-examination his testimony continued as follows:
 "`Q. Could you tell us, sir, when you saw the two boats meet, what do you mean by them meeting?
 "`A. They came to a point one-quarter mile apart, and light signals were observed from each boat. And they simultaneously started their movements to the east, and maintained the same distance between them all the way for the entire thirty miles.
 "`Q. Okay. First of all, they did not come in direct proximity with each other, did they?
"`A. They did not touch each other.
"`Q. There was a quarter of a mile between them?
"`A. Yes, sir.
"`. . . .
 "`Q. I see. Are you familiar with the position in which the Island Girl was when the Cher came to rest at some area near the Island?
"`. . . .
 "`A. The Island Girl, when the Cher went into the cut of land — Pirates Cove, the Island Girl remained in the intercoastal [sic], approximately a half mile to a mile from that place. It was just east of where the Cher left the intercoastal to go into that point of land. The Island Girl continued to a point just east of that and idled into the Intercoastal Canal.'"
 "SPO McKnight testified further that he was among those who boarded the Cher and found the bales of marihuana thereon.
 "Agent Aubrey Little of the Alabama Bureau of Investigation, (Public Safety) testified that he, with a deputy sheriff and an officer of U.S. Customs boarded the Island Girl soon after it was stopped as heretofore stated and saw the defendant as they boarded it, who identified himself by name and stated that he was the captain of Island Girl. . . ."
Although defendant was neither aboard the sailing vessel "Cher," at the time of his arrest, nor when the marijuana and numerous other articles were seized from that vessel, he challenged the search and seizure as unconstitutional by way of a motion to suppress as evidence at trial all "papers, documents, vehicles, boats, controlled substances, marijuana, firearms, and any other evidence" seized. The motion was denied by the trial court.
Reviewing that action of the trial court, the Court of Criminal Appeals held:
 ". . . As to the suppression of that evidence, appellant is without standing. There is nothing in the record or the transcript to indicate that he owned the Cher or had any legal right to possess or control it. The only evidence as to his connection with it is that which shows his connection with the contraband it was transporting. By his plea of not guilty, he denies such a connection. His position in so doing and claiming an interest in the Cher that would entitle him to the benefit of constitutional protection against an unreasonable search and seizure of the Cher is duplicitous. . . . Furthermore, whatever interest he had in the marihuana, which the jury by its verdict decided that he had, would not be sufficient to show that the Cher, or that which was searched or seized on the Cher other than the marihuana, was one of his `houses, papers, and [or] effects' as to which the Fourth Amendment to the Constitution of the United States affords security. . . ."
Defendant asserts this ruling was error because, he contends, he was entitled to "automatic standing" under Jones v. UnitedStates, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The "automatic standing rule," as enunciated in Jones, and later clarified in Brown v. United States, 411 U.S. 223,93 S.Ct. 1565, 36 L.Ed.2d 208 *Page 236 
(1973), is that a defendant has standing to test the constitutionality of a search and seizure where his indictment charges "possession of the seized evidence at the time of the contested search and seizure," 411 U.S. at 229,93 S.Ct. at 1569, without the necessity of showing an expectation of privacy in the premises searched.
That rule was expressly overturned in United States v.Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), wherein the court remarked:
 "We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched. . . .
 "We are convinced that the automatic standing rule of Jones has outlived its usefulness in this Court's Fourth Amendment jurisprudence."
However, the decision in Salvucci was handed down after the conviction of defendant in this case. We therefore conclude that defendant was entitled to automatic standing because he relied upon Jones. As the court in Salvucci stated, with respect to the defendants in that case:
 "This action comes to us as a challenge to a pretrial decision suppressing evidence. The respondents relied on automatic standing and did not attempt to establish that they had a legitimate expectation of privacy in the areas of . . . [the] home where the goods were seized. We therefore think it appropriate to remand so that respondents will have an opportunity to demonstrate, if they can, that their own Fourth Amendment rights were violated. See Combs v. United States, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972).
We find the Court of Criminal Appeals in error when holding that defendant had no standing to challenge the warrantless search and seizure. However, this was error without injury and therefore does not require reversal. Rule 45, ARAP. This, we conclude, because that court did proceed to address the merits of the search and seizure issue in another context, when it observed:
 "It should be said also that a United States Customs officer was among the officers that boarded each of the vessels and that 19 U.S.C.A. § 1581
(a) provides:
 "`Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters, or as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703-11 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect and search the vessel or vehicle and every part thereof and any persons, trunk, package or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.'"
The opinion of the appellate court does not contain any discussion of the numerous cases interpreting this statutory provision.
Defendant asserts that, although § 1581 (a) grants customs agents broad statutory authority to stop and search for contraband, nevertheless, the Fourth Amendment imposes a reasonableness requirement upon custom searches. United Statesv. Almeida-Sanchez, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596
(1973). It has been held that strict application of the literal terms of the above quoted statute to every vessel would "subvert the Fourth Amendment." United States v. Jones,528 F.2d 303 (9th Cir. 1975).
It is well-settled, however, that customs officers may conduct a search of a vessel or person at the borders of the United States or the functional equivalent of the United States borders, without a warrant, without probable cause, or even without suspicion of illegal activity. Almeida-Sanchez, supra.
But, before customs agents may legitimately conduct a border standard search, there must be a "high degree of probability that a border crossing took place." United States v. Brennan,538 F.2d 711 (5th Cir. 1976). The customs officers must be "reasonably certain" that the *Page 237 
object of the search has just entered from a foreign county.United States v. Tilton, 534 F.2d 1363 (9th Cir. 1976); UnitedStates v. Vigil, 448 F.2d 1250 (9th Cir. 1971).
Defendant contends that the "Cher" was first sighted in the intracoastal waterway, and the arresting officers had no information indicating the vessel had come from international waters. Consequently, he argues, a border standard search was improper.
Of course, on review by certiorari, we must defer to the fact findings of the Court of Criminal Appeals. Flannagin v. State,289 Ala. 177, 266 So.2d 643 (1972). As earlier quoted, that court stated the "vessel . . . had been traced upon its entry from the Gulf of Mexico to where it had been moored and abandoned by its occupants at Bear Point Marina." It is unclear from this statement whether the "Cher" was initially spotted in international waters or in territorial waters of the United States. For reasons we will state, however, it is not necessary to decide whether the facts of this case justified a border scenario search.
In United States v. Serrano, 607 F.2d 1145 (5th Cir. 1979), that Court of Appeals considered § 1581 (a) in light of facts strikingly similar to those of the instant case. Because of its close factual parallels and its treatment of what we consider to be controlling principles of law, we quote from Serrano at length:
 "During a routine patrol at Tampa Bay around midnight on June 8, 1978, Customs officers spotted a shrimping vessel approximately sixty-five feet in length traveling up the shipping channel towards Tampa without required red and green navigational lights on the bow or white light on the stern. The Customs boat pulled off to the side of the channel and then followed the vessel at a distance of a half-mile to a mile. Officers utilized night vision devices to assist surveillance. The shrimping vessel left the channel and proceeded into shallow waters as it neared Apollo Beach, a residential area with a public launching facility and marina. Its range and deck lights were extinguished, and it went dead in the water. Lights were flashed between the shrimper and a smaller vessel and the two vessels approached or closed with each other. Approximately forty-five minutes later, the shrimper returned to the shipping channel without lights. In the channel all required lights, including navigational lights, were turned on. As the vessel headed down the bay towards open waters of the Gulf of Mexico, several small boats were sighted in her immediate vicinity. Customs officers identified the vessel as the BONNIE LASS, identified themselves and boarded the vessel. A Customs officer was handed the ship's documents and questioned one of five men aboard as to whether he was the captain or the owner or master named in the documents and whether the vessel was carrying any cargo, shrimp or fish. During the conversation the officer smelled marijuana. The search which followed revealed 1,312 bales of marijuana on board.
". . . .
 "Defendants argue an unconstitutional search of the BONNIE LASS. The case was presented to the district court, and argued before this Court on appeal, as if probable cause was required in order for the boarding of the vessel to be legal. The district court found probable cause to be a close question, but held that probable cause existed for the boarding.
 "Based on recent decisions by this Court, we conclude that only reasonable suspicion of illegal activity was necessary to justify the boarding. The evidence clearly meets this standard, even though the evidence might also support the denial of the motion to suppress based on the probable cause standard.
[19 U.S.C.A. § 1581 (a) here recited]
 ". . . Searches and seizures made pursuant to . . . [19 U.S.C.A. § 1581 (a)] must, of course, meet the general standard of reasonableness imposed by the Fourth Amendment. United States v. Freeman, 579 F.2d 942, 945 (5th Cir. 1978). *Page 238 
 "This Court has considered several Fourth Amendment attacks on Customs boardings or searches conducted in inland or internal waters, the ports, harbors, bays, river mouths and adjacent parts of the sea inside the coastline. The cases have indicated that these bodies of water adjacent to the sea are not part of `customs waters' but have not decided whether random Customs boarding and document checks would be constitutionally permissible in these waters. See United States v. Whitmire, 595 F.2d 1303, 1315-1316
(5th Cir. 1979), petition for cert. filed, 48 U.S.L.W. 3262 (Sept. 5, 1979, No. 79-375); United States v. Castro, 596 F.2d 674, 676 (5th Cir. 1979), petition for cert. denied [444] U.S. [963], 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).
 "Customs boardings have been approved in inland waters where Customs officials had reasonable suspicion of a Customs violation. In United States v. Whitmire, supra, the Court assessed the constitutionality of a boarding of a boat initially sighted traveling in the intracoastal waterway but boarded only after it had reached the dock and its occupants had gone ashore. The Court held the boarding constitutional where the officers had reasonable suspicion of a Customs violation, and the boarding followed an unsatisfactory document check on shore. 595 F.2d at 1316. The Court noted that but for the fact that the boat had reached shore and defendants had disembarked, the boarding would have been justified as an `investigatory stop' under United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); United States v. Whitmire, 595 F.2d at 1308
". . . .
 "Most recently, this Court considered an inland waters Customs boarding under conditions very similar to those before us. The boarding in United States v. Castro, supra, occurred after Customs observed the boat in the intracoastal waterway heading towards open waters 20 miles away. The boarding, which occurred before the boat reached the coastline, was held constitutional based on `sufficient articulable facts to support an inference' that the vessel was involved in smuggling contraband.
 "We therefore conclude that Customs officers may make an investigatory stop of a vessel on inland waters adjacent to the open Gulf of Mexico under 19 U.S.C.A. § 1581 (a) on facts which justify a reasonable suspicion of illegal activity. The evidence need not support suspicion of a border crossing, but only of the presence of contraband. See United States v. Rivera, 595 F.2d 1095, 1098 n. 4 (5th Cir. 1979).
". . . .
 "Brignoni-Ponce includes as factors to be considered in assessing reasonable suspicion, proximity to the border, usual traffic patterns in the area, recent illegal traffic, the driver's behavior and aspects of the vehicle's appearance. 422 U.S. at 884-885, 95 S.Ct. 2574."
Following a restatement of the facts earlier set out, the court concluded:
 ". . . These observations and the rational inferences they engender reasonably warranted the Customs officers' suspicion that the BONNIE LASS was engaged in illegal smuggling activities. The stop and boarding therefore withstand defendants' constitutional challenge."
The holding in Serrano was recently reaffirmed in UnitedStates v. Ruano, 647 F.2d 577 (5th Cir. 1981), as follows:
 "The sole issue on this appeal is whether the customs agents possessed sufficient suspicion to stop appellants' vessel. United States Customs officials may make investigatory stops of vessels on inland waters `on facts which justify a reasonable suspicion of illegal activity.' United States v. Serrano, 607 F.2d 1145, 1148 (5th Cir. 1979), cert. denied, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980). This interpretation does not offend the fourth amendment. United States v. Castro, 596 F.2d 674 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979). *Page 239 
 "A customs officer testified that he stopped appellants' vessel because of the vessel's `high rate of speed,' the early hour of the morning, the fact that the vessels appeared to be travelling together, and the fact that only one individual appeared on each boat which was `inconsistent with people going out fishing.' He further testified that the boats were violating the common courtesy usually given to other vessels by slowing down when entering Government Cut.
 "Under the relaxed standard announced in Serrano, we find that these facts constituted reasonable suspicion to justify an investigatory stop. . . . [Footnotes omitted]
In light of the "relaxed standard" of reasonable suspicion of illegal activity justifying searches conducted pursuant to19 U.S.C.A. § 1581 (a), as delineated in Serrano and Ruano, applied to the facts stated by the Court of Criminal Appeals, the conclusion is supported that a reasonable suspicion existed of illegal activity taking place about the vessels. This justified the law enforcement officers, which included U.S. Customs Officers, searching those vessels and seizing therefrom contraband and other articles without violating constitutional restraints imposed upon searches and seizures.
Having resolved the search and seizure issues, we turn to defendant's contention that the Court of Criminal Appeals erred when it failed to reverse the trial court's ruling denying his motion for new trial, based on false answers given by the jury foreman during the voir dire examination of prospective jurors.
This issue was not addressed in the opinion of the Court of Criminal Appeals, although petitioner had argued it in his brief to that court. The issue was properly brought before this court, however, by petitioner's additional or corrected statement of facts pursuant to ARAP 39 (k). Bankston v. State,358 So.2d 1040 (Ala. 1978).
During the voir dire examination, defendant's attorney asked each juror about his or her jury duty experience, to which Mr. Morgan Odom, eventually selected as foreman of the jury, responded.
"I was summoned twice, but never served."
Several months after defendant's conviction, a question arose as to whether defendant had been properly arraigned for trial. In connection with the arraignment issue, defendant filed a motion to correct or modify the record. At a hearing on that motion, several witnesses, including Odom, were called to testify concerning the events which transpired on the morning of the arraignment.
After specifically testifying that he had served on the jury for the defendant's trial in July of 1978, Odom was cross-examined by defendant's attorney, during which the following exchanges occurred.
 "Q Mr. Odom, how many times have you been on a jury?
"A About four times to the best of my knowledge.
 "Q How many times have you been on a criminal jury like the one in July last year?
 "A I was on the July one last year, and I was on the marijuana one of the year before that.
"Q And that would have been in 1977?
"A Yes, sir.
". . . .
 "Q Do you recall anything else happening that morning?
 "A Mostly routine. It was kind of a funny way of striking a jury. I just never seen one struck like that.
 "All the questions that were asked. This and that, trying to prolong the court, looked to me like that.
". . . .
 "Q Do you remember anything about me saying something about wanting a continuance and one of my partners was in Washington at the United States Supreme court asking for a continuance?
 "A You asked for a continuance or you heard from one and you didn't get it, so they all prolonged waiting on your call or something. *Page 240 
 "All these questions that lasted half a day, to me it seemed like it was just prolonging the trial and stalling for time. That's my personal opinion.
". . . .
"Q Were you the foreman of the jury?
"A Yes, sir.
"Q How many times have you been foreman of a jury?
"A That's the second time I have been foreman."
Although defendant's attorney did not ascertain, by his questions, whether the four occasions of Odom's jury service occurred prior to or after the trial of defendant in this case, it is evident from the quoted responses of Odom that he had served on a jury at least once prior to defendant's conviction and, significantly, in a "marijuana case." It is further made clear that defendant's trial was the second occasion on which Odom had served as jury foreman.
Parties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes. Coalite, Inc. v.Weeks, 284 Ala. 219, 224 So.2d 251 (1969); Little v. State,339 So.2d 1071 (Ala.Cr.App. 1976), cert. denied, 339 So.2d 1073
(Ala. 1976).
However, "the failure of a juror to make a proper response to a question regarding his qualifications to serve as a juror, regardless of the situation or circumstances, does not automatically entitle one to a new trial." Beauregard v. State,372 So.2d 37 (Ala.Cr.App. 1979); Radney v. State, 342 So.2d 942
(Ala.Cr.App. 1976), cert. denied, 342 So.2d 947 (Ala. 1976).
Some cases have held that "[t]he proper inquiry in such cases is whether the defendant's rights were prejudiced by such failure to respond properly." Radney, supra; Sheperd v. State,57 Ala. App. 35, 325 So.2d 551 (1975). To be more correct, however, "[t]he test is not whether the defendant was prejudiced but whether he might have been." Beauregard v.State, supra.
It is axiomatic, however, that a party seeking reversal on appeal must not only argue a valid ground of reversible error committed below, but must also have preserved that error for review by proper procedural mechanisms.
At the trial level, defendant raised the discrepancy in Odom's answers by way of an oral renewal, based on newly discovered evidence, of his earlier written motion for new trial. The oral renewal was made more than 30 days after judgment was entered on defendant's conviction, even though the original motion for new trial was filed within 30 days of conviction.
The 30-day period statutory period for filing a motion for new trial is jurisdictional. Code 1975, § 15-17-5; Nikens v.State, 31 Ala. App. 297, 15 So.2d 633 (1943).
Where a motion for new trial filed within 30 days of a judgment of conviction does not contain a ground relative to newly discovered evidence, a defendant is not in a position to make an assertion regarding newly discovered evidence by motion for new trial after expiration of the 30-day period, even though the new evidence could not have been discovered until after that time period had elapsed. The trial court therefore acted correctly in denying defendant's motion for new trial as orally renewed. It is apparent this is the reason the appellate court did not address this issue. The oral motion to renew was both ineffective and, more importantly, too late.
Defendant also raises issues challenging the manner in which the jury was summoned, impaneled and qualified, the introduction as evidence of certain nautical charts seized by the arresting officers, and jury charges given by the trial court relative to the law of conspiracy. Upon careful review of the Court of Criminal Appeals' opinion, we find no error in that court's treatment of these issues, and refer the reader to the language of that opinion for elaboration.
For the reasons stated, the judgment of the Court of Criminal Appeals is affirmed according to the terms of this opinion.
AFFIRMED. *Page 241 
TORBERT, C.J., and MADDOX, FAULKNER, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
JONES, J., not sitting.
 ON APPLICATION FOR REHEARING