Raymond June Saxon Mims was indicted for the offenses of kidnapping in the first degree, in violation of § 13A-6-43, Code of Alabama 1975; rape in the first degree, in violation of § 13A-6-61, Code of Alabama 1975; and sodomy in the first degree, in violation of § 13A-6-63, Code of Alabama 1975. The trial court granted the State's motion to consolidate Mims's cases with those of two of his codefendants, Walter Maul and Larry Williams, who were each indicted for the offenses of rape in the first degree and sodomy in the first degree. The jury found Mims guilty of the three offenses, as charged in the indictment, and he was sentenced to three consecutive terms of life imprisonment. Seven issues are raised on appeal.
 I
The victim testified at trial that, on March 14, 1989, she had gone "job hunting" and was walking to the house of her brother's girlfriend, Valene, also known as Short. The victim testified that she "ran into" Willie Ford, also known as Batman, who asked her if she wanted a ride. Batman drove her to Short's house, and she stayed a while before walking to a store to get some milk for Short's baby. Batman later walked up to Short's house and the victim left with him. According to the victim, she and Batman stopped along the way at some picnic tables at a community center and talked. They then headed back to Short's house because she had forgotten her purse. She heard some people at the community center whistling at Batman, and she followed Batman over to talk to them. She noticed a red two-door Jaguar automobile parked in front of the center and several individuals — including Mims and Terry Harris, also known as Blue — standing around the car. She testified that Mims threw her the car keys but that she did not know how to drive.
The victim got into the car with Mims, Blue, and Batman. She testified that she asked where they were going but that she got no answer, and that she told them that she wanted to go home. According to her, Mims drove the car to Homewood and began "tailing" a green car with tinted windows. She further testified that Mims drove the car to an apartment complex in Homewood; that Mims, Blue, Batman, and she walked upstairs to an apartment; that the men knocked on the apartment door; and that Walter Maul, also known as Smokey, opened the door. She noticed that the apartment was completely empty with the exception of a large "boom box" portable radio on the floor and that Larry Williams, also known as Little Larry, and Louis Nix, also known as Bird, were also in the apartment.
The victim next testified that Maul touched her breast, and that she knocked his hand away. Mims then pulled her into the bedroom and Blue followed. Blue told her that she had better do what Mims wanted. Mims then slapped her, threw her against the wall and to the floor, and had sexual intercourse with her while she fought and screamed. Mims then told Blue that he could do what he wanted to her. Blue then had sexual intercourse with her and threatened to kill her. Maul, Bird, and Williams then had sexual intercourse with her while she fought and screamed. Someone then grabbed her from behind, and Mims, Blue, and Williams had oral sex with her. Mims then urinated in her mouth and on her face.
According to the victim, she was then carried to the living room where her clothes were taken off and she was surrounded by the men, including two new individuals, a man known as "Player" and a man with a "jericurl." Blue then had anal intercourse with the victim and "burned" her with a coat hanger whenever she screamed. Maul, Bird, Blue, Player, and the man with the jericurl then had repeated sexual intercourse and oral sex with her. Mims, Maul, and Williams left the apartment, and Blue and Bird took the victim to the bedroom where they had repeated sexual intercourse and oral sex with her over a period of several hours. *Page 123 
According to the victim, Batman was in the apartment when all these events occurred, but he never did anything. Whenever she screamed or yelled, someone turned up the volume on the "boom box" radio. She subsequently heard a knock on the apartment door and heard Mims and a girl come into the apartment. She heard the girl refer to Mims as "Raymond." Mims then went into the bedroom and had sexual intercourse with the victim. A stout man with glasses then went into the bedroom and had sexual intercourse with her. She then convinced Blue to leave her alone in the bedroom, and she locked the door. She then put on her panties, the only article of her clothing that she could find in the bedroom, and she jumped out of the second floor window and ran. A couple saw her, took her to their apartment, and called the police. The victim then went to the apartment with two police officers and identified Mims and the girl with him. According to the victim, all the other men and the "boom box" radio were gone. According to the victim, the girl said Mims had been with her all evening and Mims said he had never seen the victim before. The girl subsequently admitted that Mims had not been with her all evening.
 II
Mims contends that the trial court abused its discretion in denying his motion to sequester the jury on the ground that a juror might have seen prejudicial publicity about his case in the media.
There is a rebuttable presumption that an accused is not prejudiced when the jury is allowed to separate. Section12-16-9(d), Code of Alabama 1975; Reeves v. State,432 So.2d 543 (Ala.Cr.App. 1983).
In the case at bar, the record indicates that the trial judge cautioned the jury repeatedly not to read any newspaper articles about this case and not to discuss the case with anyone. There has been no showing that any juror saw any prejudicial news media report. During the voir dire proceedings, not one veniremember was examined in chambers about his or her familiarity with the case; hence, no juror was struck for cause because of familiarity with the facts of Mim's case. Furthermore, the daily colloquy between the trial court and the jurors concerning their exposure to news coverage revealed that the jurors did not read, see, or hear any media report of the trial.
Because Mims has not rebutted the presumption that he was not prejudiced by the jury's separation, the trial court did not abuse its discretion in permitting the separation.
 III
Mims contends that the State denied him his right to equal protection in violation of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using peremptory challenges to systematically exclude males from the jury.
This court has recently held that the standards ofBatson do not extend to gender-based peremptory strikes and that Batson applies to prohibit the exercise of peremptory challenges on the basis of race only. Fisher v. State,587 So.2d 1027 (Ala.Cr.App. 1991).
Mims's corollary contention that he was denied his right to a fair trial by an impartial jury and a fair cross-section of the community as a result of these strikes is likewise without merit.
"We have never involved the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panel or venires, to reflect the composition of the community at large." Lockhart v. McCree, 476 U.S. 162, 173,106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986).
Mims has pointed to nothing in the record which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected which would have warranted the trial court's granting his Batson motion or his motion for new trial. *Page 124 
 IV
Mims contends that the trial court committed reversible error in admitting into evidence a pistol found hidden in the apartment where the alleged crimes occurred because 1) the pistol was not sufficiently connected with either Mims, his codefendants, or the crimes charged, and 2) the apartment where the gun was discovered, several hours after the police search, was never secured to ensure against the possibility of tampering.
On March 15, 1989, the day after the alleged crimes occurred and several hours after the police had searched the apartment in question, the apartment manager and the maintenance man went to the apartment to clean it and to change the locks. The front door to the apartment was unlocked, and they observed an air conditioner vent down in the kitchen. When the maintenance man got up on the counter to replace the vent, he discovered a .357 revolver hidden inside the duct work. He gave the gun to the manager, who turned it over to a Birmingham police officer, who testified that he in turn turned it over to an evidence technician with the police department.
Although the victim testified at trial that one of her attackers, Blue, had a gun tucked in his pants and that he had threatened to kill her when he raped and sodomized her, she was never asked to identify the .357 revolver as the gun which Blue had tucked in his pants.
Officer Greg W. Carden, a Birmingham police evidence technician, testified that he processed the .357 revolver for fingerprints and that one print was lifted from the gun and turned over to the identification bureau, but that he had not received a report regarding the submission. Carden thus did not know if the print was successfully matched to anyone charged in the case.
The .357 revolver was subsequently admitted into evidence over the objections of the three codefendants 1) that there was no evidence linking it to any of the defendants in this case, and 2) that the apartment in question was never secured to ensure against the possibility of tampering or planting of "would-be" evidence. "Although the general rule is that items must be properly identified and shown to be connected with the crime, this is not an absolute rule. Where there is sufficient evidence to justify a reasonable inference that items were used by the accused in the commission of the crime charged, those items are admissible." Hayes v. State, 443 So.2d 1323, 1325
(Ala.Cr.App. 1983).
 "Before the admission of demonstrative evidence at a trial, such evidence must be identified. The testimony can be visual, that is, by testimony at the trial that the object displayed is the one related to the case. For admission, it suffices if the evidence establishes that it is more probable than not that the object is connected with the case. A preponderance of the evidence is sufficient.
". . . .
 "The lack of positive identification goes to the weight of the evidence, rather than to its admissibility. Ultimately, connexity of physical evidence is a factual matter for determination by the jury."
State v. Nelson, 261 La. 153, 164-168, 259 So.2d 46, 51-52
(1972), cited with approval in Hayes v. State, supra,443 So.2d at 1325.
 "The purpose of establishing a chain of custody is to show to a reasonable probability that there has been no tampering with an item of evidence. Congo v. State, 409 So.2d 475 (Ala.Cr.App. 1981). Identification and continuity of possession must be sufficiently established to afford ample assurance of the authenticity of the item. To establish a sufficient predicate for admission into evidence, it must be shown that there was no break in the chain of custody of the item. Ex parte Yarber, 375 So.2d 1231 (Ala. 1978)."
Golden v. State, 439 So.2d 813, 816 (Ala.Cr.App. 1983).
The lack of positive identification of the revolver and the allegation of tampering go to the weight of the evidence, rather than to its admissibility. The presence of a weapon in the apartment was relevant to the issue of consent and corroborated the victim's testimony that she saw a gun *Page 125 
tucked in Blue's pants when he repeatedly raped and sodomized her in the apartment. The fact that the revolver was not positively identified as the gun which the victim saw and the fact that the apartment was left unlocked for several hours before the revolver was discovered go to the weight of the evidence and were matters for the jury's consideration.
Even if, arguendo, the State erroneously failed to lay the proper predicate and to establish a completed chain of custody of the revolver, we view the court's admission of the revolver into evidence as harmless error. The testimony of the victim at trial overwhelmingly established that Mims kidnapped her and that Mims, Maul, Williams, and several other men repeatedly raped and sodomized her. In our opinion, after an examination of the entire cause, it does not appear that this error "has probably injuriously affected substantial rights of the parties." Rule 45, A.R.App.P.
 V
Mims contends that the trial court committed reversible error in refusing to allow Mims to examine and to use the victim's grand jury testimony for cross-examination and impeachment purposes, thereby denying his right to a fair trial. We disagree.
During the direct examination of the victim, the prosecutor elicited testimony regarding lies she had told to various police officials, to hospital attendants, and at the preliminary hearing. In particular, she testified that she lied to various police officials, to hospital attendants, and at the preliminary hearing when she stated under oath that Blue threatened her with a knife while she was walking from the community center to Short's house and that Mims and Blue forced her to get into Mims's car. Defense counsel objected to this line of questioning, asserting that the State was impeaching its own witness. The trial court overruled the objection and allowed the testimony to proceed.
Counsel for Mims, Williams, and Maul then conducted a painstaking cross-examination of the victim which included at least 37 questions with respect to the alleged inconsistences between her trial testimony and her previous preliminary hearing testimony, the police reports, and the hospital statements.
During cross-examination by counsel for Williams, the victim admitted to lying before the grand jury. Defense counsel then made a motion for the court to conduct an in camera inspection of the victim's grand jury testimony and to allow defense counsel to cross-examine the victim on this testimony if the court found inconsistencies between her grand jury testimony and her trial testimony.
The court stated that, at the conclusion of the victim's trial testimony, he would read the grand jury's notes and rule at that time.
On redirect, the victim reaffirmed the fact that she had lied at preliminary hearing and in her statement to the police and the hospital attendants when she stated that: 1) Blue and Mims forced her into the car with a knife, and, 2) Blue and Mims forcibly carried her from the car into the apartment. The victim testified that she had lied because she was afraid that no one would believe that she had been raped and sodomized if she voluntarily got into the car and went into the apartment with two of the alleged perpetrators. The victim also testified that apparent inconsistencies in the police and hospital reports as to the number of perpetrators and the order in which she was raped and sodomized were due to her hysterical condition at the time the statements forming the basis of these reports were made and the fact that she did not read and sign the reports. The victim further testified on redirect that the court reporter at the preliminary hearing erred in transcribing what she said at the hearing because she had a towel in front of her mouth while testifying and because she was crying and inaudible during part of that testimony. We note that a tape of the preliminary hearing was never introduced into evidence and made a part of the record to reconcile these purported inconsistencies. The victim also testified that the four codefendants present at the preliminary *Page 126 
hearing (Mims, Maul, Blue, and Nix) intimidated her by laughing while she was testifying.
At a later point in the trial, the court stated that it had reviewed the grand jury's notes of the victim's testimony and that the notes were not discoverable by the defense. The court noted that the jury was already aware of the fact that the victim had lied to the grand jury about the knife and the abduction.
Defense counsel excepted to the court's ruling, contending that the trial court's refusal to allow the defense to examine and to use the victim's grand jury testimony for impeachment purposes was fundamentally unfair and denied him a fair trial.
 "Before a defendant is allowed to inspect a transcript of a State's witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony . . . the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness' grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony.
". . . .
 "Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection . . . to determine (1) whether the statement made by the witness before the grand jury 'differed in any respects from statements made to the jury during trial,' . . . and (2) whether the grand jury testimony requested by the defendant 'was of such a nature that without it the defendant's trial would be fundamentally unfair.' . . . This procedure will best preserve and protect the legislative determination that 'it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings remain inviolate.' Alabama Code 1975, Sections 12-15-214 through 226."
Millican v. State, 423 So.2d 268, 270-71 (Ala.Cr.App. 1982).
Our independent examination of the grand jury's notes of the victim confirms the trial judge's finding that they are not discoverable by the defense counsel because 1) they contain no exculpatory evidence; 2) the jury was already aware of the fact that the victim had lied to the grand jury about the knife and the abduction and defense counsel was able to effectively cross-examine the victim about these inconsistencies; and 3) the grand jury testimony requested by the three codefendants was not of such a nature that without it the codefendants' trial would be fundamentally unfair.
 VI
Mims contends that the trial court erred in denying his motion for a new trial on the ground that a juror failed to properly and correctly respond to a question during voir dire examination of the jury.
During voir dire examination of the jury, the prospective jurors were asked if any of them were acquainted with any of the defendants. Counsel subsequently asked the prospective jurors the following questions:
 "Is there anybody on the venire who either themselves or some member of their family or someone who they know, has been molested or raped or kidnapped or had some act of violence performed against them?
". . . .
 "My question that was asked was intended to include people you know, not just you but members of your family or someone you know, someone that you would be concerned about it more so than just reading about it in the paper."
In his motion for new trial, Mims alleged that the husband of juror M.D.B. was killed 13 years ago by the maternal aunt of codefendant Maul.
A hearing was held on the codefendants' joint motion for new trial, at which time M.D.B. testified that she did not know any of the three codefendants and that at no time prior to the verdict being rendered did *Page 127 
she ever connect any of these codefendants or their families with the death of her husband. M.D.B. testified that her husband was killed 13 years ago, that she never knew the lady who killed him, and that she did not know Maul's aunt, Ms. Carey. M.D.B. further testified that her verdict was not tainted or corrupted by some connection between her husband's death and the three codefendants or their families. Based upon this testimony, the trial court denied the joint motion for a new trial on this ground.
It is axiomatic that the decision of the trial court to deny a motion for new trial will not be disturbed on appeal unless there is a clear showing of abuse of discretion. Nichols v.State, 500 So.2d 92, 96 (Ala.Cr.App. 1986).
 "Although the defendant has a right to have questions answered truthfully on voir dire examination of the venire, the failure of a juror to make a proper response to a question regarding his qualifications to serve as juror does not automatically entitle the defendant to a new trial. The proper inquiry is whether the defendant's rights were prejudiced by the juror's failure to properly and correctly respond."
Knighten v. State, 402 So.2d 363, 364 (Ala.Cr.App. 1981).
It is clear from the record that Mims failed to establish prejudice as a result of M.D.B.'s alleged omission, particularly in light of her testimony that the circumstances surrounding her husband's death had no effect upon her ability to reach a fair and impartial verdict in this case. The trial court thus properly denied Mims's motion for new trial on this ground.
 VII
Mims contends that the trial court committed reversible error in denying his motion for mistrial based on the cumulative effect of improper and prejudiced statements, remarks, questions, and comments made by the prosecutor in the presence of the jury throughout the trial, which violated Mims's right to due process and a fair trial.
"A motion for mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result." Thompson v. State, 527 So.2d 777, 779 (Ala.Cr.App. 1988).
In determining whether the accused was prejudiced by prosecutorial misconduct, great deference must be given to the judge's handling of the alleged misconduct during trial; the trial judge is in a much better position to understand the circumstances surrounding the alleged misconduct and to evaluate its impact that is the reviewing court. Wysinger v.State, 448 So.2d 435 (Ala.Cr.App. 1983).
Where no single instance of alleged prosecutorial misconduct constitutes reversible error, the cumulative effect of these instances cannot be considered to be any greater. Thomas v.State, 393 So.2d 504 (Ala.Cr.App. 1981).
After a thorough review of the record and the authorities cited above, we cannot say that any single instance of prosecutorial misconduct alleged by Mims constituted reversible error, nor do we believe that the cumulative effect of these instances of alleged prosecutorial misconduct constituted reversible error. The trial court properly denied Mims's motion for mistrial on this ground.
 VIII
Mims contends that the evidence presented by the State was insufficient to sustain his conviction for kidnapping in the first degree and that the trial court erred in denying his motion for judgment of acquittal on this ground.
Section 13A-6-43(a)(4), Code of Alabama 1975, defines kidnapping in the first degree as follows:
 "(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to
". . . .
 "(4) Inflict physical injury upon him, or to violate or abuse him sexually." *Page 128 
"Abduct" is defined in § 13A-6-40(2), Code of Alabama 1975, as follows:
 "(2) ABDUCT. To restrain a person with intent to prevent his liberation by either:
 "a. Secreting or holding him in a place where he is not likely to be found, or
 "b. Using or threatening to use deadly physical force."
"Restrain" is defined in § 13A-6-40(1), Code of Alabama 1975, as follows:
 "(1) RESTRAIN. To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved. Restraint is 'without consent' if it is accomplished by:
 "a. Physical force, intimidation or deception, or
 "b. Any means, including acquiescence of the victim, if he is a child less than 16 years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement."
"A conviction will not be set aside on the basis of sufficiency unless, 'allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust.' " Knight v. State, 548 So.2d 647, 650
(Ala.Cr.App. 1989).
The evidence of kidnapping against Mims, when viewed in the light most favorable to the State, is as follows: After the victim got in the car which Mims was driving, she asked where they were going and said that she wanted to go home, but she received no answer. Instead, Mims drove her to an apartment in Homewood. After the victim was inside the apartment, the front door was locked, Maul touched her breast, and the victim knocked his hand away. Mims then forcibly pulled her into the bedroom where there is ample evidence that he raped and sodomized her. During all this, Mims slapped the victim and threw her against the bedroom wall. The victim said that she wanted to go home, and she fought and screamed. Every time she screamed, Mims would slap her. Blue threatened to kill the victim, and Mims told her she had better do what he wanted. The victim continually said that she wanted to go home but was not allowed to do so. The victim finally escaped by jumping out of a second-story window, clothed in nothing but her panties. The evidence also showed the physical injury the victim suffered at the hands of Mims and the others.
It is clear from the evidence that the State proved the intent to prevent the victim's liberation and the intent to inflict physical injury upon her or violate or abuse her sexually. See Guess v. State, 507 So.2d 546 (Ala.Cr.App. 1986),aff'd, 507 So.2d 551 (Ala. 1987).
Even if a victim voluntarily enters a room, a defendant can still be found guilty of first degree kidnapping if the victim was then intentionally and unlawfully confined or concealed against her will. Musgrove v. State, 519 So.2d 565, 581
(Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala. 1986), cert. denied,486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).
Because the evidence presented by the State was clearly sufficient to sustain the verdict of guilty of first degree kidnapping, the jury verdict shall not be disturbed on appeal.
The foregoing opinion was prepared by the Honorable JAMES H. FAULKNER, a Retired Supreme Court Justice, and his opinion is hereby adopted as that of the court.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur. *Page 129