675 So.2d 487 (1995)
Darwin Gregory KNIGHT
v.
STATE.
CR-93-1974.
Court of Criminal Appeals of Alabama.
July 7, 1995.
Rehearing Denied November 9, 1995.
*490 Arthur Clarke, Mobile, for Appellant.
Jeff Sessions, Atty. Gen., and David Bjurberg, Asst. Atty. Gen., for Appellee.
TAYLOR, Presiding Judge.
The appellant, Darwin Gregory Knight, was convicted of two counts of murder made capital because the murder occurred during the course of robbing the victim of his automobile and attempting to rob him of the money in his wallet. See § 13A-5-40(a)(2), Code of Alabama 1975. The jury unanimously recommended death. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.

I
The appellant contends that the trial court erred in not granting his motion for a mistrial when it was discovered that one of the jurors failed to disclose information on voir dire. Specifically, he contends that he was prejudiced when one of the jurors failed to disclose his acquaintance with Clayton Knight, the appellant's brother and a defense witness, and also, when he failed to disclose that he knew the appellant or the fact that his wife had previously had a love affair with the appellant.
The record reveals that after the guilt phase of the proceedings and on the first day of the penalty phase, the bailiff reported to the trial court that this juror's wife approached him and told him that she had had an affair with the appellant. The court stated the following:
"The Court: We have a juror, ... number 89. [His] wife has been following the course of this trial with great interest. It turns out apparently one reason she is so interested in the trial is she tells Bailiff Bob that she in the past had an affair with Mr. Knight [the defendant] and she apparently or her conscience got to hurting her about it and she figured she had to tell somebody. So, she told Bailiff Bob. Bailiff Bob asked her to be available this morning. Well, she was here earlier this morning. He said I might want to talk with her about it and see if it would have any bearing on the case and Bailiff Bob told her to stay here at court. She isn't here at court any longer. Apparently, she has disappeared. I think she disappeared because he told her I couldn't talk with her in absolute privacy, that I would have to talk with her in the presence of counsel for both sides and the defendant and I think that may have spooked her.

*491 ". . . .
"That could be a dangerous situation. Well, you don't have to say a great deal more. If [the juror] did not answer accurately the questions that we asked him about his acquaintances or lack of acquaintances, if he didn't answer those questions accurately, he shouldn't be on this jury. I suppose wefrom this point on, of course, it is a simple enough thing because we have got a couple of alternates. I suppose there is the issue of how it affects the verdict that is already in. For that purpose we would have to question [the juror] and find out whether henow, I know he is mostly blind. He may be not much brighterhe may not be very acute. So, he may not have picked up on it. I guess we just have to see."
The court then proceeded to question the juror about Clayton Knight and the appellant. It was then also discovered that Clayton Knight was currently dating the juror's sister-in-law. (For a better understanding of the facts surrounding the case, we will provide excerpts of the court's discussions with several of the parties.) The following discussion occurred:
"The Court: Come up and have a seat....
[D]o do you know Clayton Knight.
"Juror: Well, I know him. I have seen him twice. He goes with my wife's sister.
"The Court: He goes with your wife's sister?
"Juror: Uh-huh.
"The Court: How long has he been doing that?
"Juror: Well, I don't really know, Your Honor. I just knowed them recently that they started together.
"The Court: How did you get to know him?
"Juror: Well, I got to know him over at my mother-in-law's and he came by my house about once that I knows of.
"The Court: When did he come by your house?
"Juror: It was about three weeks ago, I think.
"The Court: About three weeks ago?
"Juror: Yes, sir.
"The Court: And did he sit and visit with you a little bit?
"Juror: Well, my sister-in-law came in and we sat out on the front and talked while she was inside with her sister?
"The Court: You mean you and Clayton sat out front?
". . . .
"The Court: I asked about Cleveland Knight also.... When I asked you about all those people, how come you didn't tell us you knew Clayton Knight?
"Juror: I didn't even know none of the Knights. Clayton is the only one I have met.
"The Court: I asked you whether you knew Clayton Knight. Why didn't you tell me that?
"Juror: Well, I didn't hear you, Judge.
"The Court: You didn't hear me?
"Juror: No, sir; honestly. Well, see, at the time you were Clayton, really I hadn't met Clayton but once or twice. As far as me, he was at a distance, not just an every day thing, you know. It wasn't an every day thing. It was just here and there.
". . . .
"The Court: How did your wife get to know Darwin?
"Juror: I don't know Your Honor.
"The Court: But she
"Juror: She knew him. I don't know how. But I didn't know none of them but one.
". . . .
"The Court: I understand.... But you know that she knows Darwin Knight, really?
"Juror: Well, she said she did.
"The Court: I see. When did she say she knew Darwin Knight?
"Juror: She had told me that she knew him, I think, one day week before last or last week or one day since then.
"The Court: Maybe this week? Did she mention it to you this week?
"Juror: Well, she mentioned it this week or one dayI think it was Monday or Tuesday. She said, `I know him.' I said,

*492 `I don't.' I don't know nothing about the man. I don't even know anything about his family. All I know is when I seen him once or twice. Like I said, we both went our different directions. When I do see him, he is over to my mother-in-law's.
". . . .
"Juror: Well, the conversation came up because the simple reason she [juror's wife] felt likeShe said, `Well, I hope you don't get on the jury because I know Clayton and I know Clayton's brother.' I said, `All I have gotI don't know who you are talking about, you know.' I said, `I don't even know the man.' She said, `I know you don't know him, but I know him.' So, all I could say, you know,
". . . .
"The Court: Now, when I asked you whether you ever heard of Darwin Knight, how come you didn't say, yeah, I have heard of him. My wife and I were talking about him
"Juror: Your Honor, what I am saying is this: Okay. When you say, have you heardI never have heard the name of Darwin Knight. I have heard the name of Clayton, but not Darwin Knight. Even with my wifeI don't lager (sic) with names too long. If you tell me something at the time I hold it for a little while. After that it is erased. Now, if you continued to ask me about something, if I remember, I will tell you that I remember."
The court then questioned the juror's wife about her relationship with the appellant and any conversations she had had with the juror about the appellant and the trial. The wife stated the following:
"The Court: Now, ... how long have you known Darwin Knight?
"[Juror's wife]: How long?
"The Court: Yes, ma'am.
"[Juror's wife]: I don't know how long. It has been a while.
"The Court: Been since 1980, you have been knowing him that long?
"[Juror's wife]: Could have. I could have.
". . . .
"The Court: Great. Okay. And you and he [the appellant] have been sweethearts for a while; is that right?
"[Juror's wife]: Sure. Yes, sir.
". . . .
"The Court: Now, then, whenTell us about the conversation you had with your husband about his being on the jury in this case. Tell us about that, when did it happen?
"[Juror's wife]: When did it happen?
"The Court: Yes, ma'am.
"[Juror's wife]: About this case here?
"The Court: Yes, ma'am.
". . . .
"The Court: ... [W]e know there was a conversation. We have just finished talking with your husband. I would like for you to tell us about it?
"[Juror's wife]: What kind of conversation?"
The juror and his wife gave ambiguous and vague answers when questioned by the court. His wife refused to disclose the facts surrounding her conversation with her husband about the appellant's trial.
After the wife was questioned by the court, Clayton Knight told the court that he had met the juror on several occasions at the juror's mother-in-law's house.
The appellant was also questioned by the court. He told the court that he did not know that the juror was married to the woman with whom he had had an affair. He also stated that the woman had been in the courtroom but that he thought that she was present to provide him moral support.
The following occurred after the court talked with all of the people involved:
"The Court: Well, here is my situation. I know I could try to protect the record and say, I thought [the juror] was stupid, but, unfortunately, I just think he is dishonest and I think his wife is dishonest. And I conclude from the evidence that he knew Darwin Knight or knew of Darwin Knight when we asked the question, `Have you heard of these people,' and he didn't answer that question. But then I have got to try to figure outand I am well aware of *493 the law which says, the defendant is entitled to a jury composed of people who accurately answer the questions put to them and certainly that was a crucial question. The next thing I have got to try to figure out is whether the defendant is barred by latches or some theory from raising the point. Because certainly if the defendant had raised it before the jury started deliberating, it wouldn't have been any problem at all. It wouldn't have been anything to it. I just would have taken [the juror] off the jury and let the first alternate serve. We could have concluded this trial. But, Chris [district attorney], what I am worried about is, I would think I would have to have a pretty high degree of proof that the defendant knew [the juror] knew him. In other words, what was there for the defendant to complain about? He might have picked upHe, the defendant's old girlfriend had a husband on the jury, he might have picked that up before the jury went to deliberate. Then he waits until after he gets convicted to raise the point. Is that a waiver? Is that latches? "Mr. Galanos [district attorney]: I honestly don't know.
"The Court: Here is another question I have got for you all. I wonder if the trial can be rendered valid, assuming there is some defect in it now, assuming that simply for the purpose of analysis,I wonder if we can get the first alternate, tell the jury that the verdict of guilty has to re-examined, set aside, and then have them to deliberate again. I wonder if we can do that? Is there any reason why they couldn't do that?
"Mr. Galanos: I don't know, Judge. I just can't stand here and make an argument in good faith because I don't know.
"Mr. Hughes [defense counsel]: Judge, I have never heard of this. I am sure it has happened somewhere, but I have never heard of it.
". . . .
"Mr. Hughes: Your Honor, we would respectfully object to substitutingWe don't want [the juror] on there, but also we would object to having a new juror come in because the new juror will have been impacted in some manner by their discussions and whatever all went on in the jury room that we are not privy to. But whoever the new jurorI mean the old jurors, the original 11, that are in there will have been subject to [the juror's] input in all these things.
"The Court: What I am saying is if they are infected back there, it is an infection that this defendant caused by waiting until he could have it both ways and, therefore, that is his doing and not ours. We are goingnow, that the problem is brought to our attention we are going to do what we can to ameliorate it, but he can't complain if the jurors back there have been infected by any bad influence by the juror as he let it happen. If this defendant had mentioned this matter yesterday morning, [the juror] would have never opened his mouth to his fellow jurors because he would have been off the jury yesterday morning and the alternate would have been on there before they ever started to deliberate. I appreciate you making that a matter of record. I understand your reasoning, but I think the waiver of the disqualification applies. That is what we are going to do. Bob [bailiff], our first alternate is number 81, [Ms. M.], she calls herself. And if you could get us [Ms. M.] and she will sit where [the juror] was sitting. So, it will be Ms. [Y.] that won't participate, but Ms. [M.] will. Just ask them all to come out and be seated.
"Mr. Hughes: Judge, might I for the record just out of an abundance of caution to try to cover everything and I have never had this come up, so I don't know, but I would again renew my motion for a mistrial now because the jurors have had other people that are alternatesThey have embarked on their deliberations and now it has been changed up. We have other people in there who are not part of the jury, that are mixed in there with them. They have all been up in the jury room. We would ask for a mistrial because the jury has not been kept separate."
(Emphasis added.)
We start with the basic constitutional premise that every person is entitled to an *494 impartial jury. As stated in the Sixth Amendment to the United States Constitution: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed." (Emphasis added.)
It has long been recognized that a defendant has a right to have truthful answers to questions asked during voir dire. As the Alabama Supreme court stated in Ex parte O'Leary, 417 So.2d 232, 240 (Ala.1982), cert. denied, 463 U.S. 1206, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983):
"Parties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes. Coalite, Inc. v. Weeks, 284 Ala. 219, 224 So.2d 251 (1969); Little v. State, 339 So.2d 1071 (Ala.Cr.App.1976), cert. denied, 339 So.2d 1073 (Ala.1976).
"However, `the failure of a juror to make a proper response to a question regarding his qualifications to serve as a juror, regardless of the situation or circumstances, does not automatically entitle one to a new trial.' Beauregard v. State, 372 So.2d 37 (Ala.Cr.App.1979); Radney v. State, 342 So.2d 942 (Ala.Cr.App.1976), cert. denied, 342 So.2d 947 (Ala.1977).
"Some cases have held that `[t]he proper inquiry in such cases is whether the defendant's rights were prejudiced by such failure to respond properly.' Radney, supra; Sheperd v. State, 57 Ala.App. 35, 325 So.2d 551 (1975). To be more correct, however, `[t]he test is not whether the defendant was prejudiced but whether he might have been.' Beauregard v. State, supra."

See also Clark v. State, 551 So.2d 1091 (Ala. 1989); Mims v. State, 591 So.2d 120 (Ala.Cr. App.1991); Knighten v. State, 402 So.2d 363 (Ala.Cr.App.1981); Sanders v. Scarvey, 284 Ala. 215, 219, 224 So.2d 247 (1969).
As this court stated in State v. Freeman, 605 So.2d 1258 (Ala.Cr.App.1992):
"It is fundamental to our system of impartial justice that `"[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes."` Ex parte O'Leary, 438 So.2d 1372, 1373 (Ala.1983) (quoting Ex parte O'Leary, 417 So.2d 232, 240 (Ala.1982); State v. Gilbert, [568 So.2d 876 (Ala.Cr.App.1990)]; Little v. State, 339 So.2d 1071 (Ala.Cr.App.1976), cert. denied, 339 So.2d 1073 (Ala.1976); Coalite, Inc. v. Weeks, 284 Ala. 219, 224 So.2d 251 (1969)."
605 So.2d at 1259. See also Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944).
A Florida Court of Appeals in Mitchell v. State, 458 So.2d 819, 821 (Fla.Dist.Ct.App. 1984), also recognized a defendant's right to have questions answered truthfully during voir dire. The appeals court succinctly stated the purposes behind voir dire examination:
"The examination of a juror on voir dire has a dual purpose, namely, to ascertain whether a legal cause for challenge exists and also to determine whether prudence and good judgment suggest the exercise of a peremptory challenge. The right of peremptory challenge implies the right to make an intelligent judgment as to whether a juror should be excused. Counsel have the right to truthful information in making that judgment."
Mitchell v. State, 458 So.2d 819, 821 (Fla. Dist.Ct.App.1984). (Emphasis supplied.) See also Sconyers v. State, 513 So.2d 1113, 1116 (Fla.Dist.Ct.App.1987). "Failure to enforce the right to elicit from prospective jurors truthful answers to material questions renders hollow the right of peremptory challenge." Mitchell, 458 So.2d at 821.
There is no question that the juror in this case failed to disclose his acquaintance with Clayton Knight, who was both the appellant's brother and a defense witness. He also failed to disclose his acquaintance with the appellant. The court stated that it felt that the juror had lied about not knowing both the appellant and his brother.
Furthermore, as the Alabama Supreme Court stated in Alabama Gas Corp. v. American Furniture Galleries, 439 So.2d 33 (Ala.1983): "Perhaps the juror's failure to answer was unintentional. Nevertheless, if *495 the failure to answer was prejudicial to the inquiring party, the result is the same as if it had been deliberate."
Our inquiry now focuses on whether the appellant was prejudiced. As stated in O'Leary, supra, we must determine if the appellant's "rights were prejudiced by the juror's failure to properly and correctly respond." This court in Parish v. State, 480 So.2d 29 (Ala.Cr.App.1985), detailed several circumstances to be evaluated to determine if prejudice occurred as the result of a juror's failure to truthfully respond. The court stated:
"`"Although a defendant has a right to have questions answered truthfully by prospective jurors, the failure of a juror to make a proper response to a question regarding his qualifications does not automatically entitle a defendant to a new trial. The proper inquiry by this court in such cases is whether the appellant's rights were [probably] prejudiced by the juror's failure to respond properly. Beauregard v. State, Ala.Cr.App., 372 So.2d 37 (1979), cert. denied, Ala., 372 So.2d 44, and cases cited therein. In Freeman v. Hall, 286 Ala. 161, 238 So.2d 330 (1970), our supreme court stated:
"`"`We hold that the proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in probable prejudice to the movant. This appears to be the general rule throughout the country [see Annotations, 38 A.L.R.2d 624, and 63 A.L.R.2d 1061]....'"'
". . . .
"In emphasizing that the trial court is in the best position to make findings on the question of probable prejudice, the court in Freeman suggested factors to aid the lower courts in their task of determining probable prejudice.
"`Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: [1] temporal remoteness of the matter inquired about, [2] the ambiguity of the question propounded, [3] the prospective juror's inadvertence or willfulness in falsifying or failing to answer, [4] the failure of the juror to recollect, and [5] the materiality of the matter inquired about.'"
Parish, 480 So.2d at 31-32, quoting, in part, Freeman v. Hall, 286 Ala. 161, 167, 238 So.2d 330, 336 (1970). (Emphasis added.) See also Beauregard v. State, 372 So.2d 37 (Ala.Cr. App.), writ denied, 372 So.2d 44 (Ala.1979).
As to the first consideration listed in Parish, we hold that the juror's acquaintance with the appellant and Clayton Knight was not temporarily "remote." This juror stated, when questioned by the trial court, that he had seen Clayton as recently as three weeks before the trial. As to the second consideration, the record shows that the questions asked of the prospective jurors were not ambiguous. The prospective jurors were asked if they knew the appellant and if they knew Clayton Knight. As to the third and fourth considerations detailed in Parish, it appears from both the juror's testimony and the court's statements that the juror intentionally withheld information during voir dire. As to the final consideration, we can conceive of no circumstance where a juror's failure to disclose the fact that he knew the defendant's brother, also a defense witness, because he was dating his sister-in-law, would not be material to the intelligent use of peremptory strikes. Nor can we conceive of any circumstance where a juror's acquaintance with the defendant was not material. All of this is compounded by the fact that the juror's wife had had an affair with the appellant.
As stated above, the record reflects that the juror knew Clayton Knight. The record, however, is unclear as to whether the juror knew about his wife's prior involvement with the appellant. It is clear, however, that the juror's wife told her husband that she knew the appellant and the juror himself testified that he had seen the appellant. None of these facts was disclosed on voir dire. Applying the Freeman factors, we conclude that the appellant was prejudiced.
*496 The state urges this court to find that any error was "invited" by the appellant's failure to bring the issue to the court's attention by volunteering information. However, the defendant has the right to remain silent. United States Constitution, Amendment V; Alabama Constitution of 1901, Art. I § 6. The defendant never has a duty to volunteer information when he is in jeopardy of life, limb, or freedom. In a case involving the death penalty, invited error can be waived only when the error is not "plain error." Ex parte Bankhead, 585 So.2d 112 (Ala.1991). (Emphasis added.)
Plain error is defined in Rule 45A, Ala. R.App.P. as "an error [that] has or probably has adversely affected the substantial right of the appellant."
The United States Supreme Court has stated that the plain error doctrine should be used in those situations that "`seriously affect the fairness, integrity or public reputation of judicial proceedings....'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).
Here, the integrity of the judicial proceedings were affected. It is hard to imagine a situation that impacts more on the integrity of the judicial process than the situation presented in this case. Not only was the jury's verdict in the guilt phase tainted but the jury's decision in the penalty phase was also tainted. The record reflects that the juror discussed what had occurred at the hearing on this matter with his fellow jurors, who remained to render a decision in the penalty phase.
This case will not withstand the many years of appellate review, both in state and federal courts, that follow a conviction and sentence to death. The jury's verdict was tainted by the inclusion in the jury of the juror discussed in this opinion. This court must reverse the appellant's conviction and remand this cause for a new trial or for other proceedings not inconsistent with this opinion. As the United States Supreme Court stated in Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976):
"[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

II
The appellant also contends that his convictions on two counts of capital murder violated his rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. Specifically, he contends that his convictions for two counts of capital murder pursuant to § 13A-5-40(a)(2), Code of Alabama 1975, subjected him to prosecution twice for the same offense. After evaluating the case law, we agree.
The state indicted the appellant on two counts of murder made capital because it was committed "during a robbery in the first degree or an attempt thereof," see § 13A-5-40(a)(2), Code of Alabama 1975. The state's evidence tended to show that the appellant confronted the victim, Harold Dunn, outside a convenience store and that he pointed a pistol at him in an attempt to rob Dunn of his money and wallet. The appellant then shot the victim and drove away in the victim's car. Count one of the indictment charged the appellant with murdering the victim during the course of stealing his car and while armed with a pistol. Count two charged the appellant with murdering the victim during the course of attempting to steal the victim's money and while armed with a pistol. In effect, the indictment charged the appellant with murder committed during two robberies although there was only one act.
In United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), the United States Supreme Court addressed the scope of the Double Jeopardy Clause:

*497 "The Double Jeopardy Clause ... provides that no person shall `be subject for the same offense to be twice put in jeopardy of life or limb.' U.S. Const., Amdt. 5. This protection applies both to successive punishments and to successive prosecutions for the same criminal offense. See North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).....
". . . .
"In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the `same-elements' test, the double jeopardy bar applies. See, e.g., Brown v. Ohio, 432 U.S. 161, 168-169, 97 S.Ct. 2221, 2226-2227, 53 L.Ed.2d 187 (1977); Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (multiple punishment); Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489 (1911) (successive prosecutions). The same-elements test, sometimes referred to as the "Blockburger" test, inquires whether each offense contains an element not contained in the other; if not, they are the `same offense' and double jeopardy bars additional punishment and successive prosecution."
Dixon, 509 U.S. at 695-96, 113 S.Ct. at 2855-56.
"The test announced in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), has historically been used to determine whether two offenses are the `same' for double jeopardy purposes `"in the context of multiple punishments imposed in a single prosecution." `[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.' Blockburger, 284 U.S. at 304, 52 S.Ct. at 182."
King v. State, 574 So.2d 921, 930 (Ala.Cr. App.1990) (Bowen, J., concurring specially) (some citations omitted).
"Under this test, a lesser included offense is the `same' as the greater offense and a former conviction of the lesser offense bars a prosecution for the greater. `The state cannot elect to prosecute and try a person for a lower grade, and then put him on trial for a higher grade, of the same offense.' If the accused has been convicted of a lesser-included offense, he may not thereafter be prosecuted for the greater offense."
Connolly v. State, 539 So.2d 436, 441 (Ala.Cr. App.1988) (citations omitted).
"However, the Alabama Supreme Court has explicitly rejected a strict `elements' approach to the lesser-included/same offense determination, and has implicitly recognized the Blockburger test as a `floor' rather than a `ceiling' for `same offense' definitions."
King, 574 So.2d at 931. (Bowen, J., concurring specially.)
The appellant was charged with committing two different robberies, which occurred at the same time, one by robbing the victim of the contents of his wallet and one by robbing the victim of his automobile. However, there was only one threat made at the time the "act" occurred. "The elements of robbery had all occurred when [the appellant] made the demand and threatened the victim with a weapon." Shelton v. State, 521 So.2d 1035, 1037 (Ala.Cr.App.1987), cert. denied, 521 So.2d 1038 (Ala.1988). Alleging thefts of different items in separate counts does not convert a single theft of various items of property into separate offenses. Connolly v. State, 539 So.2d 436, 441-42 (Ala. Cr.App.1988). Under Alabama law the entire transaction constituted a single robbery, not two distinct ones.
In Floyd v. State, 486 So.2d 1309 (Ala.Cr.App.1984), aff'd, 486 So.2d 1321 (Ala. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987), the defendant murdered a taxicab driver during a robbery and stole the taxicab and the driver's money. Floyd was indicted on eight counts of murder during a robbery under § 13A-5-40(a)(2), Code of Alabama 1975. Four counts dealt with the theft of the taxicab and four counts with the theft of the money. The question presented by this case did not arise in Floyd *498 because the jury returned a general verdict of guilty of a capital offense, murder during a robbery. This court did state that an indictment could "vary the description of one and the same offense based upon one and the same transaction ... [s]ince the purpose and effect of the joinder of these eight counts was to meet every probable contingency of evidence rather than to convict [the appellant] of two or more distinct offenses." Floyd, 486 So.2d at 1313. (Citation omitted.) Although the state may indict for the same offense in alternative counts, the appellant can constitutionally be convicted of only one of the counts in such an indictment. Stewart v. State, 601 So.2d 491, 494 (Ala.Cr.App.1992).
The appellant's conviction of both counts of capital murder resulted in the appellant's being twice convicted for the same offense and thereby violated the appellant's right to be free from double jeopardy.
However, as this court stated in Stewart, 601 So.2d at 495:
"Regardless of what we do with this issue, it is clear that, technicalities aside, the jury intended that the appellant be found guilty of capital murder. We are reluctant to dismiss the decision of the court as to either aspect of capital murder. In any event, if error has occurred, the appellant can die but once."

(Emphasis added.)
In future proceedings, to guard against remands, we recommend the state should proceed under one count of the capital offense of murder during the course of a robbery.

III
The appellant also contended that the trial court committed reversible error when it allowed the state to introduce evidence that the appellant had robbed two convenience stores on the night before Dunn was killed. He also contends that the admission of evidence of prior robberies was more prejudicial than probative.
The appellant filed a motion in limine seeking to prevent the admission of evidence of these prior robberies. The trial court granted the motion and prohibited the State from introducing evidence of these two robberies. However when the defense challenged the state's identification of the appellant as the individual who had killed Dunn, the court allowed the evidence.
At trial, the appellant testified that he had shot Dunn in self-defense. The appellant stated that he had met Dunn at the convenience store to sell him a pound of marijuana and that they argued over whether Dunn owed him money for the drugs. The appellant testified that Dunn struck him in the head with a soft drink bottle and then kicked him. The appellant said that when Dunn reared back to strike again, the appellant shot him several times.
The trial court allowed evidence of the prior robberies to be received at trial, stating that the appellant had placed intent at issue by pleading self-defense. The court further stated that this evidence did not fall within his ruling on the motion in limine. The trial court stated the following about the probative value of the evidence outweighing its prejudice to the appellant:
"The Court: ... The probative value is certainly there and I am trying to weigh the prejudice and certainly there will be some prejudice. But I don't know that it is the sort which would stand in the way of the admissibility of the evidence. This robbery of the 23rd is virtually part and parcel to the same transaction. The folks buy a box of bullets and apparently decide they will commit robberies until the bullets are all gone and then I guess they will buy another box. Why isn't that the situation.... Why isn't this simply a serial robbery situation and if it's prejudice, it is simply prejudice that the defendant has brought on himself?
". . . .
"The Court: If we were talking about a couple of robberies that occurred before the buying of the bullets or the cartridges or robberies that had occurred some weeks before the killing being tried, something like that, I would have more difficulty with this decision. But where it is a serial robbery sort of thing, I just think it would be a mistake, an error for me to bar, an *499 abuse of my discretion really, to bar the state from introducing evidence. So, I am not going to bar the state. I am going to let the state go ahead and prove the conversation of December 22 and the acts that occurred on December 22 as well."
The general exclusionary rule prevents the introduction of collateral criminal acts not charged in the indictment when the sole purpose is to show the accused's bad character or to suggest that the accused possessed an inclination or propensity to commit the crime. See Robinson v. State, 528 So.2d 343 (Ala.Cr.App.1986), and C. Gamble, McElroy's Alabama Evidence § 69.01 (4th ed. 1991). Exceptions to the exclusionary rule allow evidence of the collateral offense if it is offered to prove identity, intent, motive, and common plan or scheme. In addition, an exception exists to rebut special defenses. Robinson.
"However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. `"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense.... Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.'" Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting [United States v.] Turquitt, [557 F.2d 464] 468-69 [(5th Cir.1977)] `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citation omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"' Averette v. State, supra, at 1374."
Robinson, 528 So.2d at 347. (Emphasis in original.)
In Coulter v. State, 494 So.2d 895 (Ala.Cr. App.1986), the defendant robbed a store in Mississippi the day before he robbed one in Alabama. The day after the Alabama robbery, the defendant committed a robbery-murder in Georgia. The defendant was convicted for the Georgia robbery-murder, but was never charged in the Mississippi robbery. During the defendant's trial for the Alabama robbery, evidence of the Mississippi robbery was admitted. In affirming the conviction, this court addressed the admission of the collateral robberies on the basis of intent and on common plan or scheme.
"Petitioner was not prejudiced by the admission of a reference to the Mississippi robbery at the guilt stage of his trial. Even though the trial court excluded the reference to the Georgia robbery-murder, evidence showing both the Mississippi and the Georgia crimes was admissible to show Petitioner's intent and to show that the charged offense was part of one plan or scheme. E.g., Phillips v. State, 443 So.2d 1328, 1331-1332 (Ala.Crim.App.1983); Lucy v. State, 340 So.2d 840 (Ala.Crim. App.), cert. denied, 340 So.2d 847 (Ala. 1976); Stanley v. State, 57 Ala.App. 83, 84, 326 So.2d 148 (1976); Bobo v. State, 56 Ala.App. 622, 627, 324 So.2d 336 (1975).
"Petitioner placed his intent in issue ... and lack of the intent to kill was the substance of his defense. The Mississippi and Georgia crimes were relevant and admissible to prove that Petitioner intentionally killed [the victim]. Petitioner is not entitled to relief on this claim."
Coulter, 494 So.2d at 907. (Emphasis in original.)
The appellant's attempt to distinguish the facts in his case from the facts of Coulter centers on the alleged dissimilarities between the two convenience store robberies and the robbery that resulted in Dunn's death. However, the evidence was more than sufficient to establish that all three robberies were part of a common scheme or design. Also, as in Coulter, the appellant placed his lack of intent to kill at issue, and *500 thus the prior convenience store robberies were correctly admitted as probative.
Similarly, in Minshew v. State, 594 So.2d 703 (Ala.Cr.App.1991), the defendant was convicted of the attempted murder of his former wife. The prosecution introduced evidence of the defendant's prior criminal acts against his ex-spouse and her family. This court held that these crimes "were admissible to shed light on the appellant's intent to commit the charged offense. `"If an accused is charged with a crime that requires a prerequisite intent ... then prior or subsequent criminal acts are admissible to establish that he had the necessary intent when he committed the instant crime."'" Minshew, 594 So.2d at 713. (Citations omitted.)
In this case, the state as part of its case was required to show that an intentional murder occurred during a robbery or an attempted robbery, see in § 13A-5-40(a)(2). The appellant's claim of self-defense bore directly on the issues of whether the murder was intentional and whether in fact there was a robbery. Evidence of the prior robberies was relevant to "shed light" on the appellant's intent when he fired the bullet that killed Dunn.
The question then becomes: Did the trial court err in finding that the probative value of evidence of the two prior robberies outweighed its prejudicial nature? We agree with the court's reasoning that the evidence of the two prior robberies was not "unduly and unfairly" prejudicial.
The appellant's claim of self-defense was first raised in the appellant's presentation of his evidence. The appellant stated that he went to the convenience store with the intent to sell drugs, not to rob or kill anyone and that he was forced to kill Dunn in self-defense. Thus, it was incumbent upon the State to present evidence rebutting this defense, otherwise the appellant's claim of self-defense would be unchallenged. Evidence that the Dunn robbery was but one in a series of robberies in which the appellant participated on December 22 and 23 was the only substantial and convincing evidence available to the state that directly controverted the appellant's self-defense claims and that could not be harmonized with the appellant's theory of what occurred. For this reason, the evidence was probative and the court committed no error in allowing evidence of the two prior robberies to be received into evidence.
For the reasons discussed in Parts I and II of this opinion, the judgment is reversed and the cause remanded to the Circuit Court for Mobile County for proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
PATTERSON and McMILLAN, JJ., concur.
COBB, J., dissents in part and concurs in part, with opinion, with LONG, J., joining.
COBB, Judge, dissenting in part, concurring in part.
Although I concur with the majority's holding in Parts II and III of its opinion, I respectfully dissent from the holding in Part I. In Part I, the majority holds that the trial court erred by not granting the appellant's motion for a mistrial because one of the jurors knew the appellant's brother, who was a defense witness, and failed to disclose this information during voir dire. Further, the majority contends a mistrial should have been declared because the juror failed to disclose his acquaintance with the appellant and because the juror's wife had had an affair with the appellant.
During the course of the trial, the court was informed that the juror had waved at a spectator in the courtroom. The spectator stated that she was the juror's wife. The appellant was present when this occurred. After the jury returned a guilty verdict, the juror's wife informed the bailiff, who then informed the court, that she had had an affair with the appellant. The appellant contends that, although he was present in the courtroom when she told the court that she was the juror's wife, he did not hear that conversation and he did not realize that she was married to the juror until after the guilty verdict was returned. The presence of this juror on the jury did not become an issue until after the jury had returned a guilty verdict. "`Where a defendant challenges *501 a petit juror after a verdict, the initial inquiry is whether the disqualification was a ground for the juror being mandatorily excused as a petit juror, and, secondly, whether the defendant exercised due diligence to keep the unqualified venireman off the jury.' Lollar v. State, 422 So.2d 809, 811 (Ala.Cr.App. 1982) (citing Beasley v. State, 39 Ala.App. 182, 185, 96 So.2d 693 (1957))." Bradley v. State, 577 So.2d 541, 554 (Ala.Crim.App. 1990). "`[I]n order to avail himself of the alleged error, the defendant must show himself free from fault or negligence in discovering the juror's disqualification.'" Bradley, 577 So.2d at 554, quoting Lollar, 422 So.2d at 811. Here, the appellant has not demonstrated that he was not at fault or that he was not negligent in discovering the reason that the juror should have been disqualified.
The appellant was present when the juror's wife told the judge in court that she was married to one of the jurors. Although he claims that he did not hear her give the court this information, the record clearly shows this colloquy took place. When she told the court that she was the juror's wife, the appellant should have informed his counsel of this fact and counsel could have asked for a mistrial at that point. If the appellant truly did not hear her disclosure, his negligence in discovering the reason for this juror's disqualification should not afford him the opportunity for a new trial. To allow the appellant to receive a new trial because he claims he was not aware of the woman's relationship to the juror when the relationship was fully disclosed in open court before jury deliberations would be a miscarriage of justice. I can conceive of many circumstances when defendants could use the "I was not paying attention" defense to create error. I would note that the majority does not allow the juror to plead ignorance, or failure to pay attention, as an excuse for not answering the question posed during voir dire regarding his acquaintance with the appellant's brother.
Further, it is clear that the appellant's brother knew that he knew the juror when he testified. It is not clear when he told the appellant and defense counsel of this fact. Clearly, if the appellant knew this, the appellant cannot now cry foul. However, even if the appellant was not aware until after the guilty verdict was returned that the juror and his brother knew one another, reversible error did not occur under these circumstances. The record fails to reveal any evidence tending to show how the juror might have been biased against the appellant as a result of his acquaintance with the appellant's brother. Clearly, the appellant's brother did not believe the appellant would be prejudiced by the presence on the jury of an acquaintance of his until after the guilty verdict was returned. In fact, I'm sure it is possible that the appellant's brother believed that the appellant would benefit by his girlfriend's brother-in-law sitting on the jury. Further, if the appellant did not object to the juror's presence on the jury after hearing that his former lover was married to the juror, it did not matter that he might have objected to his presence on the jury due to the fact that the juror and the appellant's brother knew each other. The appellant has not shown that he was prejudiced by the fact that the juror was acquainted with his brother.
I do not think that the record reveals any crucial piece of evidence that might tend to indicate that this juror was biased against the appellant; although it is apparent that the juror had heard of the appellant before the case came to trial. The record, as the majority points out, "is unclear as to whether [the] juror knew about his wife's prior involvement with the appellant." 675 So.2d at 496. There is nothing in the record that plainly shows that the juror did, in fact, have knowledge of this relationship. However, only if the juror had knowledge could an inference of bias by the juror against the appellant be drawn. I do not believe that the minimal acquaintance that the juror had with the appellant fairly gives rise to an inference of possible prejudice.
To find error in this case places the appellant in a "win win" situation. If he sits silently and the jury returns a not guilty verdict, he wins. If he sits silently and the jury returns a guilty verdict and he then gets a new trial when he speaks up, he wins.
Any error that may have occurred by this juror's presence on the jury was invited.
*502 "An invited error is waived, unless it rises to the level of plain error." Ex parte Bankhead, 585 So.2d 112 (Ala.1991), citing Johnson v. State, 507 So.2d 1337, 1344 (Ala.Cr. App.1985), rev'd on other grounds, 507 So.2d 1351 (Ala.1986). Clearly, this does not rise to the level of plain error.
"This Court has held that a trial judge is allowed the exercise of broad discretion in deciding whether the high degree of necessity required for a mistrial is present. See, e.g., Woods v. State, 367 So.2d 982 (Ala. 1978)." Ex parte McCall, 541 So.2d 1075 (Ala.1989). Obviously, this was a very complex situation and the trial court was in a much better position than this court to evaluate the witnesses' credibility concerning this matter and to determine any prejudice to the appellant. I do not find that the trial court abused his discretion by removing this juror from the jury during the sentencing phase of the trial or by denying the appellant's motion for a mistrial. For the reasons stated above, I would affirm the ruling of the trial court. Therefore, I dissent from Part I of the majority's opinion.